## IN RE FIRE AND EXCISE COMMISSIONERS.

**1. EXECUTIVE QUESTIONS.**

While the practice of the court has been to decline to give an opinion in response to executive or legislative questions, which might affect or prejudice private rights or interests, the gravity of the situation with respect to the pending question required a departure from the rule and an opinion upon the facts as submitted, without prejudice to the right to show other or different facts.

**2. EXECUTIVE POWER.**

The doctrine expressed in *Trimble v. The People ex rel. Phelps, ante,* 187, with respect to the power of the governor to remove a police commissioner of the city of Denver, is adhered to and approved.

**3. EXECUTIVE QUESTIONS.**

The court will not, in an *ex parte* proceeding in response to an executive question, inquire into or determine the right of a police commissioner of Denver to retain his office after the governor has attempted to remove him.

**4. JUDICIAL POWER.**

If the executive order of removal is questioned by the incumbent, the courts have power, and it is exclusively within their province, to determine, as between the respective claimants, the right to the office in question.

**5. EXECUTIVE POWER—CONSTITUTIONAL LAW.**

The governor's constitutional obligation "to take care that the laws be faithfully executed" does not impose upon him the duty of forcibly inducting his appointees into office, nor justify his calling on the military forces of the state for such purpose, unless it be for the enforcement of judicial process.

**6. SAME.**

The reasonable and inevitable delay incident to judicial proceedings can never justify a resort to the summary exercise of arbitrary power.

*The Opinion of the Court is in Response to the Following Communication from the Governor.*

" Whereas, by the terms of section 3 of art. 5 of the Constitution of the state of Colorado, it is provided, among other things, as follows:

" The supreme court shall give its opinion upon important questions upon solemn occasions when required by the governor ; and

" Whereas, in consideration of the facts hereinafter set forth and alleged, the present time and condition of affairs as therein disclosed is a solemn occasion, and the inquiry hereto subjoined in consideration of such facts and statements is an important question:

" Therefore, I, Davis H. Waite, governor of the state of Colorado, in pursuance of said provision of the constitution, do hereby call upon you, the supreme court of the state of Colorado, for an opinion upon the following question, to wit:

" What persons are legally entitled to hold the offices of fire commissioner and excise commissioner of the city of Denver at the present time?

" The foregoing interrogatory is propounded in consideration of the following facts and circumstances, to wit:

" That heretofore and prior to the 19th day of January, A. D. 1894, one Jackson Orr was the duly appointed and acting fire commissioner of the city of Denver, and as such, constituted a member of the fire and police board of said city, under the provisions of the charter of the city of Denver; and that heretofore and prior to the 19th day of January, A. D. 1894, one D. J. Martin was the duly qualified and acting excise commissioner of the city of Denver, under and by virtue of the appointment of the governor and the provisions of the charter of the city of Denver, and as such, a member of the fire and police board of said city, both of said persons holding said offices respectively by and under the appointment of the governor of the state.

" That prior to the said date, to wit, January 19th aforesaid, and while the said parties were so holding said offices, the undersigned, as governor of the state of Colorado, by an order in writing, duly signed, directed and instructed the said parties to appear before the undersigned, as governor as aforesaid, at the executive office in the city of Denver, for the purpose of answering unto certain charges which had theretofore been preferred against the said parties, and each of them, and that on the said date, the said parties, in pursuance of said order, did appear before the undersigned as gov-

ernor of the state, at the executive office aforesaid, and that thereupon the charges against them were duly presented and they made their answer thereto, the said parties appearing at said time in person as well as by counsel.

" That thereupon certain evidence was adduced and heard before the undersigned, both in support of the said charges so preferred, as well as in support of the denial thereof by the said parties so charged, and that thereafter, and on, to wit, the 7th day of March, A. D. 1894, the undersigned, as governor of the state of Colorado, in pursuance of the authority of law and the terms of the City Charter of the city of Denver, made the following finding with reference to said matter and issued the following order in writing, to wit:

" ' Executive Chamber, Denver.

" ' *In re* Charges v. Police Commissioners Jackson Orr and D. J. Martin.

" ' On the 19th of January, A. D. 1894, the above named Jackson Orr and D. J. Martin personally appeared before me at my office in Denver and made answer to the charges against them of malfeasance in office, viz.: that on Monday, January 8, 1894, on application made, the said Jackson Orr and D. J. Martin, as composing a majority of the fire and police board of the city of Denver, appointed a special policeman and sent him to remain at a gambling house in said city of Denver, not for the purpose of restraining gambling, or of obtaining proof thereof, but for its regulation or protection contrary to law, and that said action of the majority of said fire and police board was with the knowledge that it was in violation of the law.

" ' After some discussion between the executive and counsel for the defendants, the Hon. Henry Charpiot, V. D. Markham and A. H. Martin, the issues were finally agreed upon as follows: It was admitted that a special policeman was detailed on the day and date mentioned in the charge, and was sent to a gambling house, but it was denied that the said special policeman was sent to said gambling house for

the purpose of either regulating or protecting the same, but defendants alleged that the said special policeman was sent to said gambling house for the specific purpose of preserving peace, preventing riots and disturbances, preventing minors, intoxicated persons or others under disability from frequenting the said gambling house, to apprehend any person guilty of any disturbance or breach of the peace, and for the purpose of getting information as to the presence or whereabouts of suspicious characters.

" ' And upon these issues the case went to trial.

" ' The testimony was voluminous, and as bearing directly on the issues, the following is uncontradicted and quoted from the record.

#### " ' REVIEWING TESTIMONY.

" ' Mr. Gardner testified that he was a special policeman, was detailed to attend to gambling houses and received his instructions from the chief of police, which instructions were to keep out minors and not allow them to gamble, and also prohibit intoxicated men from gambling, to see that the house was promptly closed at midnight, and to report all suspicious characters to the chief of police. He had no instructions to stop gambling or report it. His hours were from 2 o'clock P. M. until midnight; saw plenty of gambling going in the gambling house. Did not wear a police uniform, but did wear a star. Was paid for his services by the gambling house.

" ' Lieutenant John F. Stone testified that he was at this time ranking officer next to the chief of police, and had held his position two years and nine months; that the instructions given to the special police were substantially as hereinabove stated; that special policemen had been detailed by Messrs. Orr and Martin to gambling houses; that shortly after Messrs. Orr, Martin and Trimble were appointed they re-established the specials put in gambling houses. These houses are kept open until midnight and anybody may enter except minors and intoxicated persons. Lieutenant Stone

testified that it was an impossibility to close all gambling houses and stop gambling in Denver, and that the appointment of special policemen was the best method to limit.gambling.

"'A. W. Kellogg, chief of police, testified that he gave instructions to all specials, which instructions he received from the board.  That the present board had detailed special policemen for gambling houses ; that Mr. Pollard was one of the special policemen for the gambling house over Tortoni's ; that no instructions were given him in relation to stopping gambling.

"' J. N. Pollard testified that he was a special policeman at the gambling house over Tortoni's ; that there were in that house a roulette wheel, faro table and card table, and plenty of gambling ; that as a special policeman he was under the instructions of the chief of the board.  The proprietors of the gambling house never gave him any instructions ; he was paid the first week by the gambling house proprietors, but received his instructions entirely from the chief.

"'TESTIMONY OF DEFENSE.

"' Ex-Commissioner W. G. Trimble, a witness produced in behalf of the commissioners, testified that he assisted defendant in the appointment of special policemen, and that he knew that they were to be sent to gambling houses, and thought that was the best plan for regulating and controlling the evil.  The special policemen were not paid by the city, but they were given to understand that they were to be under the exclusive control of the police department.

"' Commissioner Martin asked witness Trimble on his direct examination : " Is it not a fact that the police and fire board required those gambling houses to pay those policemen in their houses for the protection of their house by them, or otherwise they would be closed up ? " and witness Trimble, ex-commissioner, answered : " That was the fact of the matter."  The statute vs. gambling was also referred to.  After the testimony was completed, the executive listened to the

argument of Hon. Henry G. Charpiot, counsel for defendants, and held matter for several days that the evidence might be typewritten. An unusual pressure of official business has prevented the executive from an early consideration of this case, but after careful deliberation the executive is compelled to find the charge sustained.

" ' The defendants admit sending special policemen to gambling houses. The question at issue is only as to the object of defendants in sending these special policemen to gambling houses. The charge is that it was for the purpose of protecting or regulating the gambling business; the defendants deny this and assert that it was for the specific purpose of preserving the peace, preventing riots and disturbance, preventing minors, intoxicated persons or others under disability from frequenting said gambling houses; apprehend any person guilty of a disturbance or breach of the peace and for the purpose of getting information as to the presence and whereabouts of suspicious characters.

#### " ' THE FACTS ADMITTED.

" 'The fact is admitted that gambling houses, provided with roulette, faro and card tables, were running wide open in Denver, and with the full knowledge of the police. Special pains were taken to prove that these special policemen, though paid by the gambling houses, were under the orders and specially represented the police. The charge is that these special policemen were really protecting the gamblers' business. The answer denies this specifically, but the answer is not under oath, and neither of the defendants were sworn in the case. Ex-Commissioner Trimble testified, in answer to the inquiry of Commissioner Martin, that the police and fire board required the gambling houses to pay these special policemen in their houses for the protection of their houses by them, or otherwise they would be closed up.

" ' It appears to the executive that the charge that the special policemen are sent to the gambling houses for their protection, is fully established by this testimony of the defense.

" ' As to the answer of defendants that the special policemen were sent to the gambling houses for the specific purpose of preserving the peace, preventing riots and disturbances, preventing minors and intoxicated persons from frequenting said gambling houses, and to apprehend any person guilty of any disturbance or breach of the peace, the statute of the state quoted clearly makes using, or keeping gambling devices for use, a breach of the peace, as much as theft, burglary or riot.   Police officers are empowered to even break open doors to get at this machinery of vice.   People whom these special policemen saw gambling were engaged in the violation of law, or breach of the peace, as much as though a minor or an intoxicated person should gamble.   The law is just as imperative that a guilty person should be arrested for one crime as for the other.   The evidence clearly shows that all this violation of law was known and recognized by the defendants.

### " ' CONCLUSIONS OF THE EXECUTIVE.

" ' Aside from the direct testimony above quoted, the tone of the answer and defense is, that special policemen were sent to these gambling houses, not for the purpose of stopping any violation of law or breach of the peace known as gambling, but other violations of law, as riot, fighting, etc., which often result from the crime of gambling.   The practical effect of such a policy must be to protect the gambler in his unlawful occupation from the indignation of those defrauded by his crime.   The police might as well be sent to a prize fight, not to arrest the principals and prevent the crime, but to keep peace among the spectators, and then claim that such action was not a protection of prize fighting.

" ' I therefore find from the evidence in this case that :

" ' *First*—The defendants, as members of the fire and police board, in knowingly sending special policemen to the gambling houses of the city of Denver for the protection of said houses by the city police, were guilty of malfeasance in office ; and,

" ' *Second*—That in failing to cause to be arrested persons whom they knew to be in open violation of the law, they were guilty of neglect of duty.

" ' It is, therefore, for the cause hereinbefore specified, ordered, this 7th day of March, 1894:

" ' That Jackson Orr be, and he is hereby, removed from the office of fire commissioner of the city of Denver; and,

" ' D. J. Martin be, and he is hereby, removed from the office of excise commissioner of the city of Denver.

" ' Davis H. Waite,

" ' Governor of Colorado.'

" That the said order of removal aforesaid was duly reduced to writing and signed by the undersigned as governor aforesaid, and was for the cause therein specified, and was not for political reasons, and copies of said order of removal were on said date duly served upon the said parties named therein, viz.: Messrs. Orr and Martin.

" That afterwards and on, to wit, the 8th day of March aforesaid, the undersigned, as governor of the state of Colorado, and at the executive office in the city of Denver, and under his hand as governor as aforesaid, in writing, did order the appointment of, and did appoint, Dennis Mullins as fire commissioner of the city of Denver, vice Jackson Orr, removed, and in like manner did appoint Samuel D. Barnes to be excise commissioner of the city of Denver, vice D. J. Martin, removed.

" That the undersigned did, upon said date, in pursuance thereof, duly lodge with the secretary of state copies of said appointments, and caused the legal commissions of said parties to said offices to be issued by the secretary of state thereof. in pursuance of the laws of the state of Colorado.

" That on, to wit, the 9th day of March aforesaid, the said Samuel D. Barnes and Dennis Mullins, under and by virtue of the appointments to the respective offices as hereinbefore recited, did duly appear before one Owen E. LeFevre, the duly qualified and acting judge of the county court of Arapahoe county, and did thereupon and before the said judge receive

and sign the oath of office to the respective offices to which they had been appointed as aforesaid, as required by law; and that on said date, to wit, the 9th day of March aforesaid, the said Mullins and the said Barnes did file with the clerk of the city of Denver, at his office in the City Hall in said city, copies of the said oath of office so taken by them and duly verified, as required by law; and from thence hitherto have been ready and willing to undertake and perform all the duties of the offices to which they were respectively appointed as aforesaid, and they are now assuming to occupy said positions and to perform the duties thereof.

" The undersigned, the executive of the state, deems the present a most important and solemn occasion and one in which vast interests of life and property and the due observance of the laws of the state are involved, by reason of the following facts:

" That at the time of the making of the order of removal of said Jackson Orr and D. J. Martin from their respective positions, they and each of them, announced their intention not to surrender their said offices but to continue to exercise the duties thereof notwithstanding said removal; and they and each of them then and there and ever since have caused to be placed about the apartments occupied or set apart by the city of Denver for the use of the fire and excise commis-sioners of said city, armed bodies of men for the purpose of setting said order of removal at naught and for the purpose of resisting the said Dennis Mullins and Samuel D. Barnes, appointed respectively as aforesaid, fire and excise commissioners of said city, in any attempt that they might make to enter upon the discharge of the duties to the offices to which they have been appointed as aforesaid, and to enter into the possession of said offices, so set apart by said city of Denver.

" That in pursuance of said intention to resist and set at naught the order of removal made as aforesaid, the said Jackson Orr and D. J. Martin have exacted pledges from a large number of the officers and patrolmen constituting the police force of the city of Denver, under their charge and control,

and the officers and employees of the fire department of said city of Denver, under their charge and control, to resist by the use of force and arms any and all attempts of the undersigned to enforce the order of removal, made as aforesaid, and to resist ány and all attempts of the said Dennis Mullins and the said Samuel D. Barnes to enter into and undertake and perform the duties of their respective offices, to which they have been appointed as aforesaid, and to enter into and take possession of the apartments provided by the city of Denver for their use as such officers.

" That prior to the 15th day of March, 1894, the undersigned, as governor of said state of Colorado, announced his intention of making said order of removal effectual, by causing the said Jackson Orr and D. J. Martin to be removed from the offices and apartments then withheld by them and to enable said Mullins and Barnes to enter upon and discharge the duties of their respective offices and to occupy and to control the apartments and all the property, machinery and appliances, officers and men belonging to the fire and police department of the city of Denver.

" That in anticipation of said purpose and with the intent of obstructing and preventing the carrying out of said order of removal and of enabling the said Mullins and Barnes to enter upon and discharge the duties of their respective offices, the said Orr and Martin caused large bodies of men other than the fire and police force of the city of Denver to be supplied with fire arms and other dangerous weapons and placed in and about said City Hall and caused a large quantity of dangerous and explosive material to be stored in said City Hall, to be used for the purpose of resisting any and all efforts that might be made in the carrying out of said order of removal as aforesaid.

" That for several days last past the said Orr and Martin have withdrawn the patrolmen belonging to the said police force of the city of Denver, from their respective stations and have left the city unguarded and subject to the uncontrolled assaults of violent and lawless men and the property of the

city subject to pillage and destruction; and a large number of the members of the fire department of said city of Denver has been withdrawn from their respective stations and placed in and about said City Hall, whereby the property in said city has been and is left insecure and unprotected from the ravages of fire.

" That by the constitution of the state of Colorado, the undersigned is charged with the duty of executing the laws. That it was and is the opinion of the undersigned that he is in all respects entitled to take such steps and adopt such procedure as may insure a due observance of the law and the maintenance of the public peace and safety. That acting upon the belief that he was authorized to carry into effect any order of removal that he might make, in conformity with the law, he deemed it necessary and expedient in view of said resistance to the order of removal made as aforesaid, and in view of the unlawful gathering of men for the purpose of resisting his said order of removal, and in view of the necessity of preventing the further exercise of the powers and functions of the offices of fire and excise commissioner respectively, by those whom the undersigned has deemed unfit to occupy said offices and to discharge the duties thereof, the undersigned, in conformity with the provisions of the constitution in that behalf made, as commander in chief of the militia of the state of Colorado, upon the 14th day of March, 1894, duly called upon a number of the military forces of the state of Colorado, to assist in the enforcement of the laws of the state and in the removal of said Orr and Martin from the positions so wrongfully held by them, and remove them from the offices and apartments occupied by them in the City Hall of the city of Denver, and to prevent their directing and controlling the fire and police department of the city of Denver, and from directing and controlling the use of all the property, fire engines and other apparatus belonging to the fire and police department of the said city of Denver, and on, to wit, the 15th day of March, 1894, said militia under the command of the proper officer,

assembled in said city of Denver, subject to the orders of the undersigned, as the commander in chief.

" That on said 15th day of March, 1894, as commander in chief and for the purpose of carrying out the order of removal made by the undersigned, as the governor of the state of Colorado, as aforesaid, the said military force was directed to proceed to the said City Hall in the city of Denver, and demand of the said Orr and Martin that they vacate the offices and apartments so unlawfully withheld by them and that they desist and refrain from further interference with or control over the offices and patrolmen of the police department of the city of Denver, or the officers of the fire department of the city of Denver, or any of the property, engines or machinery belonging to the said fire and police department.

" That upon said demand being made by the proper officer in charge of said force, the said Orr and Martin refused to vacate their said offices or apartments or to surrender the control of the offices and patrolmen of the police force of said city, or the officers and employees of the fire department of said city, or of the property, machinery and appliances of said fire and police department, and refused to relinquish their assumed control over the said fire and police departments.

" That said military force was met by an armed body of men, consisting of not less than three hundred, stationed in and around the said City Hall, supplied with fire arms and other dangerous weapons and with dangerous explosives, which it was declared was the intention to use in resisting any and all force that might be made under the authority and by the direction of the undersigned in the enforcement of the laws of the state to remove said Orr and Martin from their said offices and apartments and to prevent their exercising control over the said fire and police departments of the said city of Denver. That although repeatedly called upon to vacate and surrender said offices and apartments and to cease assuming to perform the duties and functions of the

offices of the fire and excise commissioner, the said Orr and Martin refused so to do but declared their intention to resist removal by the use of arms and to the extent, if necessary, of taking human life.

"That the emergency of the occasion became such and the danger of an outbreak so imminent that a large number of citizens concerned in the safety and welfare of the city of Denver and in the preservation of life and property applied to the undersigned to prevent any conflict between the opposing forces.

"That the undersigned is firm in the belief that the measures so adopted by him were required by the constitution and the laws, and to the end that good government might be advanced and the safety of the citizens of Denver assured, and the laws of the state enforced, has ordered the militia to remain under arms to the end that the said Orr and Martin may by force, if necessary, be compelled to abandon their said offices and apartments and to absolutely desist from further assuming to act and exercise and perform the offices of fire and excise commissioner respectively; and the said Orr and Martin still continue to maintain large bodies of armed men in and about the said City Hall, and still threaten to resist by the use of arms and by taking of life, if necessary, any enforcement or execution of the order of removal made as aforesaid into effect.

"That the arming of large bodies of men by said Orr and Martin and the withdrawing from their said respective stations of the members of the police force of said city of Denver have put the citizens of said city of Denver in fear of danger to life and property, and the undersigned, for the purpose of assuring the people of their lives and property has deemed it necessary to call upon the government of the United States to furnish military forces for the purpose of aiding himself in the enforcement of the laws of the state and in preserving peace and good order in the city of Denver.

"That in response to said request made as aforesaid, about

three hundred and fifty soldiers of the United Army have been brought from Fort Logan and stationed within the limits of the city of Denver for the purpose of aiding the undersigned in preserving law and order and in protecting the citizens in their lives and property.

" That in view of said armed body of men placed by said Orr and Martin in and about said city hall and because of menace caused thereby to the peace and security of the city of Denver the undersigned has deemed it his duty for the preservation of law and order to call upon all of the National Guard of the state of Colorado to place themselves under arms in their respective armories, subject to the call of the undersigned as commander in chief to report in the city of Denver.

" That by reason of said armed resistance and because of the feeling engendered among the people on account of the questions mentioned, warm and bitter feelings have been engendered, likely to lead to a conflict amongst the citizens of the city of Denver and to great loss of life and property.

" That the situation is still more grave from the fact that said Barnes and Mullins, acting upon the appointment as above set forth, together with Andrew J. Rogers, the duly appointed and qualified police commissioner of the city of Denver have organized and constituted themselves the fire and police board of the city of Denver and are exercising all of the duties and functions of the fire and police board of the city of Denver, and are intending to enlist a full and complete fire and police force for said city of Denver, and there is grave reason to believe that a conflict at any time may ensue between the rival forces assuming to act as said fire and police forces.

" That by reason of the foregoing matters and things the situation as shown therein is so grave and critical as to demand the instant attention and the speedy decision of the court upon the question herein proposed ; inasmuch, as it is the hope of the undersigned that such decision may be the means of effecting a peaceable settlement of the various grave situations hereinbefore referred to and to the end that peace

and good order may be maintained and upheld without the further use of force.

"Very respectfully submitted,

"DAVIS H. WAITE,

"Governor of Colorado.

"DENVER, March 17th, 1894."

The questions presented were discussed by Mr. PLATT ROGERS, Mr. CHARLES HARTZELL, Mr. J. WARNER MILLS, Mr. THOMAS WARD, JR., Messrs. WELLS, TAYLOR & TAYLOR and Mr. H. B. O'REILLY.

MR. JUSTICE GODDARD delivered the opinion of the court.

We have uniformly declined to give an opinion in response to executive or legislative questions propounded under section 3, article VI of the Constitution, that might affect private rights or prejudice private interests. A strict adherence to this rule of practice would preclude our answering the present inquiry, since it in terms calls for an *ex parte* decision of the rights of contesting claimants to an office. But the gravity of the situation and the impending danger to life and property disclosed by the accompanying statement, imperatively demand that we so far depart from this rule as to give an opinion upon the facts as submitted, without prejudice to the rights to show other or different facts. We do this hoping thereby to allay popular excitement and avert riot and bloodshed. We feel more at liberty in so doing in the present instance for the reason that the power of the governor to remove incumbents of the offices of fire and excise commissioner has recently been thoroughly and elaborately argued before us, and upon careful consideration decided by this court in the case *Trimble v. The People ex rel. Phelps*, *ante*, 187. In that case the power of the governor to remove an incumbent of the office of police commissioner of the city of Denver, for cause other than political, was clearly recognized. Chief Justice Hayt, speaking for the court, said:

" The statute only requires that the reason for removal shall be other than political, and that it shall be stated in writing. The words ' but not for political reasons ' are words of limitation, and could have been deemed necessary by the legislature for but one reason, to wit, that otherwise the governor might remove for political purposes. The intent on the part of the legislature to confer the power of removal for any other cause satisfactory to the governor is made plain by the words of limitation. * * * The legislature had the power to provide for the creation of a police commissioner for the city of Denver; it had the power to provide the manner in which such office should be filled, and there can be no doubt that it had like power to provide for removals. * * * The investiture of the power of removal here given is restricted in but two particulars; it must not be exercised for political reasons, and the cause of removal must be stated in writing. In considering removals under this act, we must assume that the lawmaking body was of the opinion that the requirement that the cause of removal should be stated in writing was the only check necessary to prevent an arbitrary and oppressive abuse of the power. * * * Under the statute the cause that may be sufficient to warrant removal is to be determined by the governor, and no mode of inquiry being prescribed, he is at liberty to adopt such mode as to him shall seem proper, without interference on the part of the courts. * * * The governor having determined that a sufficient cause for removal existed, and having exercised the power confided to him, relator is without remedy in this proceeding. It is the duty of the courts to uphold the executive power, as it has been conferred by the legislature."

Therefore, if the statement of the cause assigned for the removal of Orr and Martin be accepted as true, as it must be upon this inquiry, and the removal was made therefor and not for political reasons, the action of the governor was clearly within the power conferred upon him by the legislature under the doctrine announced in that case, and it follows that upon notice of such order of removal the right of Orr

and Martin to hold the offices and exercise the powers of fire and excise commissioners of the city of Denver terminated; and Mullins and Barnes, if duly appointed and qualified as set forth in the foregoing statement, were entitled to enter upon the duties of those offices respectively.

But it further appears from the communication submitted that Orr and Martin refuse to surrender the offices, and for some reason question the validity of the order of removal and the legality of the appointment of Mullins and Barnes. We are not advised upon what ground they rest their refusal or predicate their right to retain the offices; nor can we in this *ex parte* proceeding inquire into or consider them. Their sufficiency must be determined in a different proceeding, and should in the first instance be submitted to another tribunal.

Certain expressions in the *Trimble case, supra,* were referred to and relied upon in argument as announcing a doctrine the reverse of this. In that case the power of removal by the executive was contested upon various grounds. One of these grounds was that a determination as to whether a cause of removal existed was judicial in character, and it was also contended that the governor could not act in the absence of a statute fixing the procedure. It was in answer to the latter claim that the following language was used:

" The office of police commissioner is created by the statute; it was accepted by the relator under the conditions imposed by the act, among which was that the incumbent should hold it subject to removal by the governor for cause. Under the statute the cause that may be sufficient to warrant removal is to be determined by the governor, and no mode of inquiry being prescribed, he is at liberty to adopt such mode as to him shall seem proper, without interference on the part of the courts."

The words "without interference on the part of the courts," as the context shows, have reference to the procedure only; that as to this, the executive could adopt such mode as he might deem proper and suited to the occasion; that it was

not contemplated by the act that he should be required to institute an inquiry in its nature judicial.

No question was then mooted as to the power of the courts to entertain any appropriate proceeding to ascertain the title to the office in case the incumbent should attempt to hold over in opposition to the executive order. On the contrary, in that case, the jurisdiction of the court was invoked by the removed official and his right to the seat was denied as a result.

So also the following language used in the *Trimble case,* viz.: " The governor having determined that a sufficient cause for removal existed, and having exercised the power confided to him, relator is without remedy in this proceeding," had reference to the facts then before the court. The contestants by petition and answer had brought the facts relied on fully to the attention of the court for its judgment thereon ; there was no pretense that anything further could be shown material to the issue. The court did not say to the petitioner, " You had no right to test the validity of the removal in this proceeding; " but it did say, in effect, " The facts shown by the record are not sufficient to warrant a decision in your favor, and the judgment of ouster entered by the district court was unwarranted and must be set aside."

That no further doubt may exist upon this question, we say, without hesitancy, that if the executive order of removal is questioned by the incumbent, the courts have the power, and it is exclusively within their province, to pass upon such objections and determine as between the respective claimants the right to the office in question, and the law provides a plain and adequate procedure for that purpose ; and a speedy determination of such question is insured by express statute. Mills' An. Stats., p. 830. All law-abiding citizens will, and all others should be required to, submit such controversies to these tribunals for settlement. The district attorney is empowered by statute to bring an action for that purpose. Code, 289.

It was suggested by counsel in argument that an unquali-

fied answer to the precise question presented should be given, and it was asserted that this court is bound by its own precedents to make response.

The *Speakership case*, 15 Colo. 520, was referred to in support of these suggestions. That case bears little or no analogy to the present controversy. The constitution invests the house of representatives with the power of electing its own speaker, and no other department of the government has any voice in the matter; but, in the present controversy, as already shown, a resort to ordinary judicial proceedings is the proper mode of determining who are entitled to the offices of fire and excise commissioners.

It is true, in the *Speakership case*, Governor Routt asked, among other questions, " Who is now the speaker of said house ? "  This court did not, however, give a direct answer, but submitted certain questions for argument, as follows :

" (1) Has the court any authority under the constitution and laws to pass upon the matters thus presented for its opinion ?

" (2) What is the state of the law, parliamentary or otherwise, pertaining to the subjects covered by the executive inquiry ? "

After the argument the court remarked in its opinion that a judicial opinion in respect to an *ex parte* inquiry from the executive department concerning the affairs of the legislative department, was anomalous and peculiar, and also indicated that the court could not adjudicate the speakership contest and enforce its views in a direct proceeding.   Nevertheless, the court felt bound to express an opinion in obedience to the constitutional mandate.   After considering the state of the law, parliamentary and otherwise, and the constitutional objections urged against the power of the house to remove its speaker, the law was declared by the court as follows : '

" The house of representatives has the power, by the vote of 'a majority of the whole number of members elected,' to remove its speaker from office and to elect another in his

stead, in the manner stated in the executive communication submitted."

The court did not, however, assume to state who was speaker; but observed that the majority of the house " must assume and bear the responsibility for the exercise of their powers."

It was further urged in argument that this court should not make any observations concerning the powers and duties of the executive; that to do so would be an interference with a co-ordinate department of the government.   In response to executive questions this court has in every instance endeavored to show that respect to the governor which is due to his high office.   We have always recognized, as we do now, that the three governmental departments are co-ordinate, and that neither can lawfully encroach upon the province of the other.   And while we concede to the governor full liberty to submit such questions as he may deem consistent with his *executive* powers, this court reserves for itself the right to express its opinion freely, in whole or in part, or not at all, as it shall deem consistent with its *judicial* powers and constitutional obligation.   An opinion controlled or restricted by other influences than our own judgment and consciences, would not be the opinion of the court.

But it is contended that the statements in reference to calling out the military were inserted for the purpose of showing the importance of the question and the solemnity of the occasion under which the question was submitted.   Such was undoubtedly the purpose of the statements.   Were it not for the threatened dangers by force, military and otherwise, the question propounded would not be important nor the occasion solemn.

We will not for a moment entertain the idea that in submitting this question his excellency, the governor, was actuated by other than a sincere desire to be advised as to the extent and scope of his statutory and constitutional powers, so that he may act advisedly and correctly in the discharge of his official functions; nor do we believe that he is averse

to receiving any dispassionate advice that may enable him better to know and perform those functions. We feel in duty bound, therefore, after having entertained and decided, as definitely as we feel at liberty to do, the specific question submitted, to go further and express our views upon those features of the situation that more directly affect the public welfare and are of more vital importance to the community than the question, "Who shall discharge the duties of fire and excise commissioner?"

We are clearly of the opinion that the governor is greatly in error in assuming that it devolves upon him to enforce his order of removal. His constitutional oath to " take care that the laws be faithfully executed " imposes no such obligation upon him.

His duty and responsibility cease upon the making of the order or appointment, and any attempt on his part to personally enforce such order or install his appointee is beyond any express or implied duty or power imposed or conferred upon him by constitution or statute.

The police, fire and excise commissioners, though appointed by the governor, are not charged with duties pertaining to the chief executive department of the state. They are municipal officers, the same as the mayor and other officers of the city elected by the people. We are unable to see how the governor is charged with the duty of seating a member of the fire and police board any more than he is charged with the duty of seating any municipal officer elected by the people. Will it be contended that it is the duty of the chief executive of the state to install into office, by force if necessary, every county, precinct or municipal officer whom he may deem entitled to such office in advance of the determination of any controversy that may arise concerning such office? A proposition so fraught with danger to every principle of free government cannot for a moment be entertained; and if such power cannot be lawfully exercised by the governor acting in his civil capacity, *a fortiori* is the use of military force to that end by him as commander in chief, unauthorized.

The constitution expressly provides (sec. 22, Bill of Rights) "that the military shall always be in strict subordination to the civil power." The governor's warrant as commander in chief to call out the militia of the state is found in section 5, art. 4 of the Constitution, which reads as follows:

"The governor shall be commander in chief of the military forces of the state * * * he shall have power to call out the militia to execute the laws, to suppress insurrection or repel invasion."

There can be no pretense that the conduct of Orr and Martin constitutes the insurrection contemplated in the foregoing provision, and therefore the call must have been based upon the ground that the militia were needed "to execute the laws." We repeat that by no rule of construction can the power and duty imposed upon the governor "to execute the laws" be held to authorize the forcible induction of an appointee into office. In this provision of the constitution, the phrase, "to execute the laws," contemplates the enforcement of a judicial process—that is, the enforcement of a right or remedy provided by the law and judicially determined and ordered to be enforced, and not an arbitrary enforcement by the executive of what he may consider the law to be. Cooley's Const. Lim., pp. 87–92.

We thing it too clear for argument that if Orr and Martin were guilty of the conduct charged and were acting in violation of law in resisting removal, their wrong doing affords no justification for calling out the militia to forcibly eject them.

A proper regard for the reputation and peace of the community would dictate that the claimants institute proper proceedings in court to determine their right to the offices. In this way a speedy and peaceful result can be reached, and the person entitled to the office installed therein without disturbance or delay.

So much has been said as to the delay incident to ordinary judicial proceedings, we desire to call attention again to our statute above cited, which requires proceedings of this character to be advanced; and if parties are diligent, the courts

will not permit unnecessary delay, but other causes will be postponed in order that proceedings of this kind may be speedily determined. Some delay is, of course, inevitable. Reasonable time must always be allowed for the consideration of the rights of the parties in the administration of justice under a free government. Monarchical and despotic governments can undoubtedly proceed more speedily than a representative government in the enactment, administration and execution of the laws. Reasonable delay is the price we pay in order to secure the protection and vindication of personal and property rights under a government like ours; and when it is once conceded that the hardship resulting from such delay justifies a resort to the summary exercise of arbitrary power, either by the civil or military authority, then will justice be dethroned and despotism or anarchy usurp her seat.