# JANUARY TERM 1913.

[No. 7978.]

## IN RE INTERROGATORIES OF THE SENATE.

1. LEGISLATIVE OR EXECUTIVE QUESTIONS—*Doctrine of the Court*—
It is the settled doctrine of the court that where a question is propounded by either the legislative or executive department, under sec.
3, art. VI of the constitution, the court will decide for itself whether
the occasion is one demanding a response.

2. ——*Where Private Rights Are Involved*, the court will not
give an *ex parte* opinion in response to such interrogatories.

Before the canvass of the vote, the person chosen to the office of
lieutenant governor at the election held in November, A. D. 1912, departed this life. The person chosen to the same office at the previous
biennial election was assuming to hold over, and preside in the sessions of the senate, though the senate, under sec. 10 of art. V of the
constitution had elected a president *pro tem*. The senate having propounded to the court question as to the right of this person to so hold
over, under the provisions of the constitution, *held*, that inasmuch as
the officer so assuming to hold over was unquestionably an officer *de
facto*, and his acts as such necessarily valid, the question was not one
of sufficient importance or solemnity to demand the expression of an
opinion by the court.

The opinion of the court is in response to the following
communication from the senate:

"To the Honorable Supreme Court of the State of Colorado: Pursuant to the provisions of the constitution of the
state of Colorado in that behalf made and provided, the senate, one of the houses of the nineteenth general assembly, now
in session, does hereby respectfully submit certain questions
hereinafter propounded, and does respectfully request that you
furnish and deliver your opinion thereon at the earliest possible moment; and the court is hereby advised of the following

facts necessary to be stated for the rendition of judicial opinion upon said questions, viz.:

A general election was held in the state of Colorado on the fifth day of November, A. D. 1912, pursuant to the constitution and laws of said state; that at said election one Benjamin F. Montgomery was a candidate upon the democratic ticket for the office of lieutenant governor of said state, for the term beginning on the second Tuesday of January, A. D. 1913; that at the canvass of the votes duly held by the joint session of both houses of the nineteenth general assembly, on the 3rd day of January, A. D. 1913, it appeared from said canvass that Benjamin F. Montgomery, candidate for lieutenant governor on the democratic ticket, received a plurality of all votes cast.

That on the 30th day of December, and prior to the canvass of said votes, the said Benjamin F. Montgomery departed this life; that at the general election held on the 7th day of November, A. D. 1910, one Stephen R. Fitzgarrald was duly elected lieutenant governor of the state, took the oath of office and has been and now is the duly elected, qualified and acting lieutenant governor of the state of Colorado, and was such at the time of the death of said Benjamin F. Montgomery, and at the time of the canvass of said votes; that it also appears and is a fact that at the time of the death of the said Benjamin F. Montgomery the said vote had not been canvassed, and no certificate of election had been issued to said Benjamin F. Montgomery, or to any other person for the office of lieutenant governor, and none has yet been issued; that Benjamin F. Montgomery or no other person voted upon at the election held in November, 1912, for the office of lieutenant governor has taken and filed the oath of office as lieutenant governor of the state of Colorado, pursuant to said election and canvass.

That at a session of the senate held on the 3rd day of January, A. D. 1913, the said Stephen R. Fitzgarrald, lieutenant governor and president of the senate, made the following

statement in reply to a request made by senator Burris from the second district:

'Senator from the Second, and Gentlemen of the Senate:

I first want to say that the death of Col. Montgomery has made no greater wound in any heart in this state than in mine, outside of his own family. He was a splendid citizen, and our state has lost a grand character. His record is an open book and he has left as a heritage to the people of this state and to his friends something that we would all be proud to leave for ourselves. His voice was always lifted for the betterment of the people of this state, and Colorado is much poorer today than it was before he died. But the good old man is gone, and this situation presents itself to me personally. It has given me a great deal of concern as to what was my duty in the premises. I have had the advice and counsel of a great many good friends, and have had the assistance of some of the very best lawyers of the state, who have volunteered their services to look up the matter for me. I have consulted a great many authorities myself, in order that I might come to a conclusion befitting a gentleman and a member of the executive department of this state. I am glad that you have asked this question at this time, so that the record may show my position in the matter. I have come to this conclusion: That it is my duty to hold this office until my successor has been elected and duly qualified as provided by the constitution of this state. After having arrived at this conclusion, no one could do more, and no one would want to do less, so that you may know that after the 14th of this month I shall consider it my duty to exercise the duties of this office until my successor has duly qualified, and I want to say to this senate that I am not going to object to whatever action you may take, only to preserve my legal rights. I am just as anxious to know whether I will be the lieutenant governor after January 14th as you are. Nevertheless, I desire to preserve my legal rights and that it is only upon legal grounds that I have stated somewhat my reasons, so the senate may take their own

course and I will take mine. I have been advised by my friends and counsel that it is my duty to hold the office until it is determined who is my legal successor, so you may take whatever action you please, and I thank you for this opportunity of expressing myself and I don't think any good citizen would do differently than I have determined to do in this matter.'

That on Tuesday, the 7th day of January, A. D. 1913, the senate of the nineteenth general assembly, elected William H. Adams president *pro tem* of the said body, and thereafter said Adams took the oath of office as president *pro tem* and entered upon his duties as such officer.

NOW, THEREFORE, In view of said existing conditions and to enable the senate of the nineteenth general assembly of the state of Colorado to discharge its legal and constitutional duties in the premises,

BE IT RESOLVED BY THE SENATE of the State of Colorado that the following questions be submitted to the supreme court in the state of Colorado for its opinion in the premises, which said questions are as follows, towit:

Interrogatory 1: Does said Stephen R. Fitzgarrald, the present duly elected, qualified and acting lieutenant governor of the state of Colorado, continue to hold the office of lieutenant governor on and after the 2nd Tuesday of January, A. D. 1913, under the provisions of sections 1, 3, 6, 14 and 15 of article IV, and sections 1 and 10 of article XII of the constitution of the state of Colorado? .

Interrogatory 2: If the said Stephen R. Fitzgarrald does not hold the said office of lieutenant governor of the state of Colorado, who, under the provisions of the constitution above referred to, or what officer is entitled to perform the duties of the office of lieutenant governor, on and after the second Tuesday of January, A. D. 1913?

BE IT RESOLVED, That said court is hereby respectfully advised and informed that in the opinion of the said senate, the questions, and each of them, so submitted are import-

ant questions upon a solemn occasion, and that the situation is so grave and serious that the highest public interest requires that the said honorable supreme court shall, at the earliest possible moment, render and deliver its opinion to the said senate upon each, every and all of the foregoing questions."

The questions presented were discussed by Mr. W. H. Malone, Mr. Stephen R. Fitzgarrald, Mr. John D. Milliken and Mr. Benjamin Griffith.

MR. JUSTICE WHITE delivered the opinion of the court:

In considering interrogatories propounded under section 3 of article VI of the constitution, this court, soon after the adoption of the constitutional provision, established certain rules governing the practice to be observed in the exercise of the jurisdiction conferred. As the authority conferred and duty imposed upon the court to give its opinion is "upon important questions, upon solemn occasions," and not whensoever required by the governor, the senate or the house of representatives, it was held that the duty rested finally upon the court to determine for itself as to the solemnity of the occasion and the importance of the questions propounded. Moreover, that the question must relate to purely public rights, be propounded upon a solemn occasion, and possess a peculiar or inherent importance not belonging to all questions of the kind; that executive questions must be exclusively *publici juris,* and legislative ones be connected with pending legislation, and relate either to the constitutionality thereof or to matters connected therewith of purely public right.—*In the Matter of the Constitutionality of Senate Bill No.* 65, 12 Colo. 466, 471; *In the Matter of Senate Resolution on the Subject of Irrigation,* 9 Colo. 620; *In Re Appropriations,* 13 Colo. 316, 321; *In Re Speakership,* 15 Colo. 520; *In Re Fire and Excise Com.,* 19 Colo. 482; *In Re House Bill No.* 99, 26 Colo. 140; *In Re Senate Resolution No.* 10, 33 Colo. 307.

At an early date, speaking through chief justice Helm, this court, in *In the Matter of the Constitutionality of Senate Bill No.* 65, 12 Colo. 466, 471, 472, said: "We feel con-

strained to repeat and emphasize the thought heretofore expressed, that the utmost vigilance and caution be exercised by both the general assembly and the court in acting under this novel constitutional authority. There cannot well be too much moderation in the premises. We note that, in those states which permit consultation with the justices, the privilege seems to be less often invoked than it has been here. The attorney general is the natural as well as the statutory legal adviser of the executive and legislative departments. His counsel should be solicited; and only as a *dernier ressort,* upon the most important questions and the most solemn occasions, should the court be requested to act."

He further therein said that, "While the question must be one relating to purely public rights, it can only be propounded upon solemn occasions, and it must possess a peculiar or inherent importance not belonging to all questions of the kind. * * * Upon mature investigation and reflection we are of the opinion that executive questions must be exclusively *juris publici,* and that legislative questions must be connected with pending legislation, and relate either to the constitutionality thereof, or to matters connected therewith, of purely public right. We believe that the accuracy as well as the wisdom of this interpretation will commend themselves alike to the legislative judgment and the legal mind."

And in referring to that decision Mr. Justice Elliott, speaking for the court in *In Re Appropriations, supra,* said: "The latter opinion was announced after much consideration, and is authority for saying that this court must decide for itself, as to any given question, whether or not it should exercise the jurisdiction of answering the same; and that only questions of law *publici juris,* and not questions affecting private or corporate rights, should be thus answered. That decision was based upon the fundamental doctrine that for this court to answer questions of the latter class, *ex parte,* would inevitably result in disposing of the rights or claims of litigants without due process of law, without counsel, and with-

out allowing them their day in court."

And in *In Re Fire and Excise Commissioners, supra,* it is said: "While we concede to the governor full liberty to submit such questions as he may deem consistent with his executive powers, this court reserves for itself the right to express its opinion freely, in whole or in part, or not at all, as it shall deem consistent with its judicial powers and constitutional obligation." It is further therein said: "Were it not for the threatened dangers by force, military and otherwise, the question propounded would not be important nor the occasion solemn." And in the same opinion, on page 499, upon the question of an incumbent of an office attempting to hold over in opposition to an executive order of removal, it is said: "* * * if the executive order of removal is questioned by the incumbent, the courts have the power, and it is exclusively within their province, to pass upon such objections and determine as between the respective claimants the right to the office in question, and the law provides a plain and adequate procedure for that purpose; and a speedy determination of such question is assured by express statute. Mills' An. Stats., p. 830. All law-abiding citizens will, and all others should be required to, submit such controversies to these tribunals for settlement."

And in *In Re Senate Resolution No. 10, supra,* "Private rights, the title to an office, or the construction of an existing statute will not be determined in an *ex parte* proceeding in answer to a question from either the legislative or executive departments."

These rules have been applied, and such has been the practice in this state for a fourth of a century. Occasionally, it may be, as pointed out in *In Re House Bill No. 99, supra,* "There was a departure from it, but an examination of those cases shows that it was for reasons held conducive to the public welfare, and because the cases were of extreme emergency. * * * When we thus made answer we deviated somewhat from the established practice to which, at the first opportunity,

we now return.   In doing so, we are satisfied that we are pur-
suing the only safe course, and one that commends itself to
the judgment of the thoughtful and earnest legislator, as well
as to the members of the bar and publicists who have given to
the subject careful attention."

Those cases, nevertheless, it should be observed, carefully
avoided determining any private rights.   There was involved
in *In Re Speakership,* the legality of the organization of the
house of representatives, each of two rival organizations
claiming to constitute that body.   Incidentally, the court was
asked, among other things, to say who was then the speaker
of the house of representatives.   We did not give a direct an-
swer to the question.   On the contrary, we held substantially,
that as the constitution invests the house of representatives
with the power to judge of the election and qualification of its
members, and likewise invests it with the power to elect its
own speaker, and such power is continuing and no other de-
partment of the government has any voice in the matter, such
branch of the general assembly "must assume and bear the re-
sponsibility for the exercise of their powers," and that it could
remove and elect another speaker at its pleasure.

*In Re Fire and Excise Commissioners, supra,* involved
the right of the executive to remove certain fire and excise
commissioners from office in the city of Denver, appoint others
in their stead, and induct the latter into office by force.   As
the court had previously held that the power of removal and
appointment in that respect was vested in the executive, it
therein reaffirmed the holding and declared that the constitu-
tional oath of the executive to "take care that the laws be
faithfully executed" imposed no obligation upon him to en-
force his order of removal, and that a proper regard for the
reputation and peace of the community would dictate that the
appointees institute proper proceedings in court to determine
their rights to the office.   In other words, the *Speakership*
case declared that the house of representatives was the tri-
bunal to ascertain and determine who was its speaker.   While

the *Fire Commissioners'* case declared that the governor was the person invested by law to hear charges against and remove for cause the fire and excise commissioners of the city of Denver and to appoint their successors. This was in effect saying only that whatsoever person, body or tribunal, invested by law with the power to appoint or remove from public office, has the exclusive right to exercise the power, and it is the duty of good citizens to accept and abide by that which is so done in the premises.

The matters involved in *In Re Senate Resolution No.* 10, *supra*, concerned a contest for the governorship, pending before the general assembly. It was therein pointed out that the contestor and the contestee were actual litigants before the general assembly, having submitted their respective claims to the determination of that body, and as the questions submitted to the court for answer arose out of that contest, the parties litigant were necessarily before the court as to the matters involved, and it was not an *ex parte* proceeding.

Testing the questions propounded by the rules established, it is evident that we should not assume jurisdiction in the premises. The occasion is not of sufficient solemnity, and private rights are involved. It is conceded that when the nineteenth general assembly convened it was the duty of Stephen R. Fitzgarrald to appear in, and preside over the deliberations of the senate during the term for which he was elected. Sec. 14, art. IV, constitution. It is likewise conceded that it was the duty of the senate, at the beginning of its session, to elect one of its members president *pro tempore*. Sec. 10, art. V, constitution. We are advised by the resolution that such duties were duly performed, and the only circumstance in addition thereto is, that on the 3rd day of January, during the time Fitzgerrald was unquestionably the lieutenant governor, he stated to the senate, in answer to some inquiry made, that he had concluded it was his duty, under sections 1 and 10 of article XII of the constitution, to hold the office of lieutenant governor after the 14th of January until a successor ap-

peared, elected and qualified as such officer, or until such time as it was legally determined otherwise. This is the extent of the controversy as disclosed by the resolution and questions propounded. If Montgomery had lived, qualified for the office and assumed the duties thereof, the senate would, nevertheless, have elected a president *pro tempore.* So it does not appear that the orderly procedure of the senate has been affected by that which has occurred, or that Fitzgarrald's claimed right to perform the duties of lieutenant governor been legally questioned. Whether Fitzgarrald is rightfully entitled to hold over, his acts as such officer are necessarily valid. If he be not the *de jure* lieutenant governor, he is unquestionably such officer *de facto.* This is elementary. 29 Cyc., p. 1392. He was legally in the office. He is still therein, actually performing the duties thereof. Under these circumstances, surely the occasion is not one of solemnity, and we are not authorized under the constitutional provision to answer questions propounded to the end that solemn occasions may not arise. It is only upon solemn occasions that we are authorized to act. Moreover, it is not to be presumed that either public officials or private citizens will disregard the orderly procedure of the law, but, on the contrary, when claimed rights are questioned, or sought to be questioned, resort will be had to the proper tribunals established for the purpos of determining such matters.

Furthermore, to answer the questions propounded would, as hereinbefore stated, involve a determination of private rights in an *ex parte* proceeding. It would necessarily determine the title to the office of lieutenant governor and to whom the salary pertaining to such office properly belongs. If Stephen R. Fitzgarrald is the lieutenant governor, entitled to perform the duties of that office, he is likewise entitled to receive the emoluments thereof, but if he is not the lieutenant governor, and some other person is entitled to perform the duties of such office, the latter person is entitled to receive the

emoluments of the office.—*People ex rel. v. Cornforth,* 34 Colo. 107.

Such private rights can not be determined in an *ex parte* proceeding to which such possible claimants of the office, and the salary pertaining thereto, are in no wise parties. If any public official or tax-paying elector desires to question the right of Mr. Fitzgarrald to hold the office of lieutenant governor, the law has provided a tribunal and adequate procedure for that purpose, wherein both private and public rights may be properly considered and protected. Such was the case and procedure in *People ex rel. v. Cornforth, supra,* wherein this court assumed original jurisdiction.

We shall continue, as heretofore, to observe the requirements of all constitutional provisions, including the one now under consideration, and take pleasure in rendering such assistance to every department of government as shall be consistent with our duty and in harmony with a sound exposition of the constitution. To adhere to the rules established by this court we deem wiser and more seemly than to place a different interpretation upon a constitutional provision that would necessarily bring confusion and uncertainty. We are persuaded that this course will commend itself to both the legislative and the legal mind.

In view of the foregoing consideration we respectfully ask the honorable senate to recall the questions propounded.

Decision *en banc.*

Mr. Justice Hill and Mr. Justice Scott dissent.

Mr. Justice Hill dissenting:

I cannot concur in the conclusion reached by the majority. As I read the resolution from the senate it discloses, that the candidate who received the highest number of votes for the office of lieutenant governor at the election held in November, 1912, departed this life after the election; that he never qualified as such officer; that the present senate, pur-

suant to the provisions of section 10 of article V of the constitution, elected one of their number as president *pro tempore;* that the lieutenant governor elected in November, 1910, claims the right to the office for the present biennial term, or the right to hold over, as it is termed, until his successor is elected and qualifies.   Section 14 of article IV of the constitution reads:  "The lieutenant governor shall be president of the senate, and shall vote only when the senate is equally divided.   In case of the absence, impeachment, or disqualification from any cause of the lieutenant governor, or when he shall hold the office of governor, then the president *pro tempore* of the senate shall perform the duties of the lieutenant governor, until the vacancy is filled or the disability removed."   Upon account of the above and other sections of the constitution, and the circumstances above set forth, it is evident that the senate is in doubt as to the proper person to be recognized as its presiding officer after January 14th, 1913, when both the lieutenant governor elected in 1910 and the president *pro tempore* of the senate elected at the beginning of the present regular session are present and claim the right to so act.   Under such circumstances this becomes an important question and to my mind presents a solemn occasion.

The senate, in order to be advised as to the proper interpretation to be given the different sections of the constitution upon this subject, so that they may act advisedly and thus avoid any attack upon, or criticism pertaining to, their proceedings, have submitted the interrogatories.   As I view the questions, they are, in part, *publici juris* and in my opinion should be answered to the extent of placing an interpretation upon these different sections of the constitution sufficient to cover the question concerning the presiding officer of the senate.   In my judgment, this position is supported by the following opinions of this court.—*In Re Senate Resolution No.* 10, *Concerning Governorship Contest,* 33 Colo. 307; *In Re Fire and Excise Commissioners,* 19 Colo. 482; *In Re Speakership of the House of Representatives,* 15 Colo. 520.

Mr. Justice Scott dissenting:

I cannot concur in the conclusion of the court, to refuse in this instance to give its opinion upon the questions propounded by the senate. The provision of section 3, article VI, of the constitution of Colorado, is as follows:

"The supreme court shall give its opinion upon important questions, upon solemn occasions, when required by the governor, the senate, or the house of representatives; and all such opinions shall be published in connection with the reported decisions of said court."

I am not unmindful of the fact that this court has assumed to itself in such cases, the absolute right to determine whether or not a question is important, or the occasion solemn. I cannot agree that this was the intendment of this constitutional provision. Such power of the court is in my judgment unwarranted, either by the language or purpose of this provision. The language is distinctly mandatory upon the supreme court, and there is not even a suggestion of discretion upon its part. The word "require" as used in this connection can have no meaning other than the right to demand as by right and authority. This right to demand is specifically conferred upon two of the co-ordinate branches of the government, and the duty of the other branch of the government to obey is to my mind clear.

It is true that this court has said, 33 Colo. 321, "The department propounding the question in the first instance determines whether an occasion exists which justifies its submission." But qualifies this declaration by asserting, "But it remains for the court to finally determine that proposition." I regard this qualification as a clear assumption of power, in no way to be reconciled with the language of the section of the constitution, or the essence of the proposition stated by the court. The right to propound the question rests, necessarily, upon the right to determine that the occasion exists, and only after such determination. That question having been deter-

mined by the department having the declared right, it is illogical and incongruous to say that such determination may be reviewed and set aside by another department to which the question is addressed, having no express authority to do so. This would reduce the constitutional enactment to an absurdity. The people through their constitution, have the same power to command courts, as legislatures and executives are commanded, and it is not for the former to complain or attempt to decree otherwise. Certainly where the right to thus determine a given state of facts, is conferred upon one department of the state government, it is not within the province of another department to assume to be the sole arbiter as to its importance.

But the power to determine that an occasion is important or solemn, is not such an unusual or extensive power as to justify the assumption of doubt as to its meaning. Greater and entirely exclusive powers have been conferred upon both the executive and the legislature charged with the responsibilities of government. It would therefore seem that executives and legislators have at least equal opportunities and equal judgment with courts, as to the importance or solemnity of problems presented to them.

It is not necessary to recite the many grave questions which the legislature alone may determine. The same may be said as to the executive. This court has said that he may even declare a state of insurrection and suspend the writ of habeas corpus without consulting any other department of the state government. Surely then, he may be trusted to determine when such an important or solemn occasion is presented to him as to require the lagol advice of the court. Likewise either branch of the general assembly.

Courts should not impute to executives or legislatures, the doing of foolish or useless acts. These should be regarded as expressing their solemn conviction within their respective spheres. To refuse to answer the questions in this instance is to refuse to obey that which I regard as an imperative consti-

tutional mandate, or on the other hand, to assume a power neither expressed nor reasonably implied.

In the case of *Opinions of Justices* (Maine) 51 Atl. 224, cited by counsel, while the majority of the court held to the view now expressed by the majority here, yet the argument of the dissenting justices is so convincing, and so replete with judicial authority as to appear unanswerable. This case was decided as late as 1902, and it is there said:

"Against this long and unbroken array of precedents for more than a century (40 years under the Massachusetts constitution and 80 years under our own similar constitution), and against the opinions of the eminent jurists cited, we have in this state but the one late solitary instance where the justices refused to answer a question duly propounded, that in 1891, when the justices refused to answer the inquiry of the governor as to his power to remove a county attorney. 85 Me. 545, 127 Atl. 454."

And again:

"The early practice under any constitutional provision is admittedly of very great, and even controlling, force when such practice does not conflict with the express words of such provision. It is well known as matter of history that members of the convention drafting the constitution afterward became governors, legislators, and judges under it. They best knew the scope and purpose of its provisions. The people who themselves voted upon the adoption of the constitution would more quickly notice any departure from its letter or spirit. If, therefore, we find a comparatively uniform practice under a constitutional provision by the earlier incumbents of office, acquiesced in by the persons or officers unfavorably affected by it, and not opposed to clear, express language of the constitution, such practice is a better, safer guide to the real meaning and scope of the provision than any verbal, grammatical, or even philosophical interpretation by subsequent generations in after years. Broom, Leg. Max. 658, 884; *Cohen v. Virginia,* 6 Wheat. 418, 5 L. Ed. 257; *Rhode Island v. Massachusetts,*

12 Pet. 657, 9 L. Ed. 1233.; *Rogers v. Goodwin*, 2 Mass. 475; Gray, C. J., in *Opinion of Justices*, 126 Mass. 594.

In obedience to the constitution as thus authoritatively interpretated by the unvarying practice of more than a century, —40 years in Massachusetts to the time of the separation, and then in Maine for 70 years more until 1891,—we give our opinion upon the questions submitted briefly as follows:"

But if the view of the majority of the court be admitted, still under the decisions of this court, the questions here should be answered. While the form of the questions submitted may be unfortunate, yet these in fact simply ask the court for an interpretation of certain constitutional provisions, seemingly necessary for guidance of the senate.

It is urged that these should not be answered because the questions involves a private right, that is to say the title to an office, that of lieutenant governor, and that under the rule of the court such title can only be determined in another and different proceeding. It must be admitted that to an extent, a private right is involved, but it likewise involves a question of grave public concern, compared with which the private right sinks into insignificance.

In the *Speakership Case,* 15 Colo. 520, the question propounded by the house of representatives, was as to the power of that body to declare the office of speaker vacant, and the court answered that it had such power. Plainly this involved a constitutional private right, to-wit: title to the office of speaker, which like the office of lieutenant governor, carries with it the right of succession to the governorship.

In the case, *In Re Senate Resolution No.* 10, 33 Colo. 307, the question as to whether or not the joint assembly had the power to declare the office of governor vacant, was answered by this court. This was a contest for the office of governor, was purely a political matter over which this court could have no control, and it would be difficult to understand how the office of lieutenant governor can involve a clearer case of private right.

*In Re Fire etc. Commissioners,* 19 Colo. 482, involved the power of the governor under the law as it then stood, to remove the fire and police commission of the city of Denver. These were offices carrying salaries and the court in that case admits the existence of private right, but declares that the gravity of the situation demands an answer to the question propounded.

This case clearly illustrates the unsoundness of the rule adopted by the majority in the matter before us, and makes clear the reasoning in *Opinion of Justices, supra,* having reference to the dissenting opinion as follows:

"Whether the questions submitted are important, or whether there be sufficient occasion for their solution, is not itself a question of law, or a judicial question. These are rather political questions in the broad sense of that term. When the requirement is made by the house of representatives, they are pre-eminently questions for the house itself to consider and determine. The house is a political agent of the people. It has the sole power of impeachment. It is the grand inquest. With the senate and the governor, it is the judge of what is for the people's welfare, is charged with the duty of seeking out abuses, disorders, and irregularities in the public service and is also charged with the duty of their reform or removal. The justices are by the constitution (article 3, sec. 2), excluded from that sphere of duty and action, and limited to judicial questions. Even in cases where all the facts and conditions are public, and known to all the justices, it is certainly doubtful if they are to override the judgment of the representatives of the people, that those acts and conditions render the questions of law important and the occasion solemn. But the justices can never be sure they know all the facts and conditions. There may be—perhaps in this case—many facts and conditions known to the house and not known to the justices, clearly showing the given question to be important, and the occasion sufficiently solemn. It has never been the practice, nor is the house obliged by anything in the constitution,

to state facts affirmatively showing the question to be import-
.ant and the occasion solemn.   We do not think the justices
should treat the house as a suitor, nor its order like a petition
demurrable for want of sufficient allegation of facts."

But if we are to assume the exclusive right to determine
whether or not the question is important and the occasion
grave, we cannot escape the conclusion that such is the case
before us.

The questions by the senate presuppose a desire upon its
part to obey the constitution, and we cannot doubt that the
several constitutional provisions, under the state of facts pre-
sented, admit of serious question.

The lieutenant governor is not a member of the senate.
That body under the constitution, consists of thirty-five mem-
bers, elected from districts, created by law, and of which mem-
bership the lieutenant governor cannot be one.   He presides
over the senate simply by virtue of his office as lieutenant gov-
ernor, and which duty is simply incidental to his office.   If he
is not lieutenant governor, can he preside, or exercise any of
·the powers and duties of the presiding officer?   The actual offi-
cial duties of this officer as such are limited, Micawber like, to
simply waiting for something to turn up, and when this some-
thing does turn up he no longer performs the duties of lieuten-
ant governor, but rather the duties of governor.

It is suggested that even though he may not be the lieu-
tenant governor, in fact, yet his acts are valid as a *de facto*
official.   ·

From what I have said of the duties of the lieutenant gov-
ernor as such, it would seem that as a *de facto* official, he
would have as much substance and power as the proverbial
hole in a doughnut.   Can he preside and give validity to his
acts as the president of the senate, unless he is the actual lieu-
tenant governor?   He cannot preside as president *pro tem,* for
the senate may elect only one of its members to such position.

It is urged that in permitting him to preside, the senate
thus recognizes the validity of his acts.   Does the mere recog-

nition by the senate, validate an invalid vote? Can the senate be said to be charged and bound by mere recognition, when in the exercise of all its power it cannot elect or place in authority, the official so said to be recognized?

The constitution confers upon the president of the senate the power to cast the deciding vote when the senate is equally divided. Thus while he is not a member of the senate, yet in this particular he is given certain powers of a legislator. Will this court say that there can be such a thing as a *de facto* legislator, casting votes and making laws? To my mind this is inconceivable.

Again, it is the constitutional requirement that the presiding officer of the senate shall in the presence of the senate, sign all bills and joint resolutions passed by the assembly. This seems to be clearly mandatory. Are we ready to say that one who is not the lieutenant governor, and who is not eligible to election by the senate, as president *pro tem*, may sign them? Are we ready to say that if such bills are not signed by the proper officer that they are not for such reason invalidated?

The questions are purely legal and the members of the senate are not presumed to be learned in the law, yet all these legal questions which may vitally effect the whole people of the state are before them. Are these matters not important and can this court say that the occasion is not sufficiently grave as to require its advice when requested?

I am clearly convinced that the matter is of such importance as to make the refusal of the court to answer a serious error. Beside, I do not understand that the answer requested is anything but advisory, and may be reviewed or changed upon a more formal and complete investigation. I regard the constitutional mandate binding on the court, and against which we may not interpose a rule of procedure, a precedent, or the convenience of the court. The senate is entitled to know and the whole people are entitled to know the view of the court upon so serious a legal question.