2013 CO 62

**IN RE: Interrogatory Propounded by Governor John HICKENLOOPER Concerning the Constitutionality of Certain Provisions of Article XXI, § 3 of the Constitution of the State of Colorado.**

**Supreme Court Case No. 13SA214**

Supreme Court of Colorado.

October 21, 2013

John W. Suthers, Attorney General, Leeann Morrill, First Assistant Attorney General, Kathryn Starnella, Assistant Attorney General, Matthew D. Grove, Assistant Attorney General, Denver, Colorado, Attorneys for Colorado Secretary of State.

Heizer Paul Grueskin LLP, Mark G. Grueskin, Martha M. Tierney, Denver, Colorado, Attorneys for Senator Angela Giron, Senator John Morse, and the Colorado Democratic Party.

The Matthew C. Ferguson Law Firm, P.C., Matthew C. Ferguson, Aspen, Colorado, Attorneys for Libertarian Party and Gordon Roy Butt.

JUSTICE RICE delivered the Opinion of the Court.

¶ 1 The Governor of the State of Colorado submitted an Interrogatory to this Court pursuant to Article VI, section 3, of the Colorado Constitution asking whether the prior participation requirement in Article XXI, section 3, of the Colorado Constitution conflicts with the First and Fourteenth Amendments to the United States Constitution. This Court exercised its original jurisdiction and issued an Order holding that the prior participation requirement in Article XXI, section 3, conflicts with the First and Fourteenth Amendments to the United States Constitution. This opinion explains that Order.

## I. Facts and Procedural History

¶ 2 In June 2013, citizens in Pueblo and El Paso County certified petitions to recall State Senator Angela Giron and State Senator John Morse. On July 19, 2013, the Governor set a September 10 recall election for both Morse's and Giron' s Senate seats. This recall election was the first in Colorado's history for members of the General Assembly.

¶ 3 On August 23, 2013, with the recall election only weeks away, the Governor submitted the following Interrogatory for this Court's consideration:

Colo. Const. art. XXI, § 3 requires an elector who wishes to vote for a successor candidate in a recall election to also cast a ballot on the recall issue. Is this requirement consistent with the First and Fourteenth Amendments to the United States Constitution?

¶ 4 The following Monday, August 26, this Court ordered the Governor, the Attorney General, the Secretary of State, the El Paso County Clerk and Recorder, the Pueblo County Clerk and Recorder, Senator Angela Giron, Senator John Morse, the Colorado Democratic Party, the Libertarian Party of Colorado, the Republican Party of Colorado, and any other interested persons to file briefs addressing the Governor's Interrogatory by the next morning. The Secretary of State, the Libertarian Party of Colorado joined by Gordon Roy Butt, and both Senators filed briefs within this Court's abbreviated deadline.

¶ 5 After considering the briefs, this Court took jurisdiction over the "important question" presented and issued an Order striking down the prior participation voting requirement in Colorado's Constitution:

The provision in Article XXI, Section 3, of the Constitution of the State of Colorado stating that "no vote cast shall be counted for any candidate for such office, unless the voter also voted for or against the recall of such person sought to be recalled from said office," conflicts with the First and Fourteenth Amendments to the United States Constitution. We therefore answer the Interrogatory in the negative.

¶ 6 Consistent with our earlier Order, we now describe in detail why Article XXI, section 3, of the Colorado Constitution violates the First and Fourteenth Amendments to the United States Constitution. Before reaching the substance of the Governor's Interrogatory, we explain this Court's jurisdiction.

## II. Jurisdiction

¶ 7 Our Constitution commands that—when the Governor requires and a

"solemn occasion[ ]" presents itself—this Court will offer its opinion "upon important questions.". Colo. Const. art. VI, § 3. In determining whether to exercise original jurisdiction pursuant to this constitutional provision, "It is impossible to state any absolute rule by which the sufficiency of this importance and the degree of this solemnity can be determined." *In re Senate Resolution Relating to Senate Bill No. 65,* 12 Colo. 466, 468, 21 P. 478, 479 (1889). To be sure, the Governor's request, without more, does not create a "solemn occasion" demanding this Court's attention. For example, this Court refused to exercise its extraordinary jurisdiction in 1943 where doing so would resolve an individualized and speculative dispute. *See In re Interrogatories by Governor,* 111 Colo. 406, 411, 141 P.2d 899, 901–02 (1943). In refusing to assert jurisdiction, this Court explained that answering the Governor's interrogatory "in effect would be to attempt, without the interested parties being before us, to prejudge a private controversy, which may be brought before us through regular judicial channels." 111 Colo. at 411, 141 P.2d at 902. Thus, a speculative and private dispute masquerading as an interrogatory from the Governor does not warrant this Court's original jurisdiction.

¶ 8 Likewise, in 1960, this Court declined to exercise original jurisdiction when the Governor submitted eleven interrogatories for this Court to consider "before the expiration of the thirty day period in which [the Governor had] to sign or veto the measure." *In re Interrogatories Propounded by McNichols Concerning Senate Bill No. 34,* 142 Colo. 188, 189, 350 P.2d 811, 812 (1960). The interrogatories each implicated the intricate interplay between pending legislation and various constitutional provisions. For instance, the fourth interrogatory asked:

Does Senate Bill No. 34 contravene Article X Section 7 in that under the provisions thereof, particularly Section 7, the power granted corporate authorities of a city or town to impose sales or use taxes for municipal purposes is conditioned upon prior imposition of such taxes for county purposes by the county commissioners of the county in which such city or town is located?

142 Colo. at 190, 350 P.2d at 812.

¶ 9 Faced with ten more interrogatories of the same ilk, a divided Court declined to exercise original jurisdiction because it doubted the "wisdom of prejudging ... complex legal problems and fundamental constitutional questions in proceedings like this." 142 Colo. at 192, 350 P.2d at 813. The Court, moreover, did not read article VI, section 3, to require it to "act when possible prejudice may well result later to our citizens whose rights are protected by both the state and federal constitutions." *Id.*

¶ 10 The single question presented here is different. Unlike the aforementioned, very fact-specific cases, this Interrogatory asks this Court to consider whether a Colorado Constitutional provision governing the operation of a recall election conflicts with the United States Constitution. The Governor's Interrogatory, in other words, does not involve pending legislation that, once enacted, might rise or fall on the merits of an individual controversy. Nor does it involve an individualized or speculative dispute between hypothetical private parties. Rather, the single question presented by this "solemn occasion" involves citizens' fundamental right to vote in a fast-approaching election.

¶ 11 Executive interrogatories must involve questions "publici juris,"[1] not merely questions of private rights. *Wheeler v. N. Colo. Irrig. Co.,* 9 Colo. 248, 252, 11 P. 103, 105 (1886). The Governor's Interrogatory implicates the very essence of the publici juris doctrine, which involves those questions "where the interest of the state at large is directly involved ... or the liberty of its citizens menaced." 9 Colo. at 253, 11 P. at 105.

¶ 12 The state interest in this matter is clear: the right to vote freely "is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims,* 377 U.S. 533, 555, 84 S.Ct. 1362, 12

---

1. *Black's Law Dictionary* defines "publici juris" as "[o]f public right; *of importance to* or available to the public." 1350 (9th ed. 2009) (emphasis added).

L.Ed.2d 506 (1964); *see also* § 1–7.5–102, C.R.S. (2013) ("[S]elf-government by election is more legitimate and better accepted as voter participation increases."); *Bruce v. City of Colo. Springs,* 971 P.2d 679, 684 (Colo.App.1998) ("[A] compelling state interest exists in having voters fully participate in the election process.").

¶ 13 The right to vote also implicates the liberties of Colorado's citizens; indeed, the right to vote is considered "fundamental" because it is ultimately "preservative of all rights." *See Harman v. Forssenius,* 380 U.S. 528, 537, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965) (citation omitted). "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *People ex rel. Salazar v. Davidson,* 79 P.3d 1221, 1228 (Colo.2003) (citation omitted).

¶ 14 Other state supreme courts have held cases implicating their citizens' right to vote to be "publici juris." *See, e.g., Hutcheson v. Gonzales,* 41 N.M. 474, 71 P.2d 140, 151 (1937); *State ex rel. Fosser v. Lavik,* 9 N.D. 461, 83 N.W. 914, 914–15 (1900) (holding that the case presented a question publici juris because it involved "the exercise of the elective franchise, ... the most sacredly guarded franchise granted by the state"). Similarly, the Rhode Island Supreme Court exercised its advisory opinion authority in 2004, explaining that it did so to avoid chaotic post-hoc decision making in the elections context:

> Because we believe the [referendum] question ... to be unconstitutional, to delay the issuance of our opinion would only postpone the inevitable. If we were to sit idly by while an unconstitutional question was submitted to the voters, only to later issue a binding decision declaring ... the referendum question void, chaos might well ensue. By delivering our advisory opinion before the question is submitted to the voters, we give credence to this Court's recognition of the prevailing public policy in favor of finality and validity of the voting process in this state ... [and] the

strong preference for resolving election issues before the voters have spoken.

*In re Advisory Opinion to Governor,* 856 A.2d 320, 326–27 (R.I.2004).

¶ 15 Indeed, when assessing voters' fundamental right to vote in the moments preceding an election, there are no do-overs. *See Erickson v. Blair,* 670 P.2d 749, 754 (Colo. 1983) ("[T]he right to vote is a fundamental right of the first order."); *W–470 Concerned Citizens v. W–470 Highway Auth.,* 809 P.2d 1041, 1043 (Colo.App.1990) ("If ... the conduct sought to be redressed is peculiar to a particular election, the occurrence of the election itself will moot the controversy.").

¶ 16 We therefore conclude that this solemn occasion requires that we give our opinion upon the important question in the Governor's Interrogatory. *See* Colo. Const. art. VI, § 3.

### III. Analysis

¶ 17 The portion of Article XXI, section 3, of the Colorado Constitution at issue provides that a vote for a successor candidate does not count "unless the voter also voted for or against the recall of such person sought to be recalled from said office." Put simply, this provision conditions a voter's ability to vote for a replacement candidate upon the voter's affirmative participation in answering the recall question. This prior participation requirement cannot pass constitutional muster because it severely burdens voters' First and Fourteenth Amendment rights.

¶ 18 "The right to vote freely for the candidate of one's choice is of the essence of a democratic society." *Reynolds,* 377 U.S. at 555, 84 S.Ct. 1362. As such, the Fourteenth Amendment protects citizens' right to vote because the "[o]ther rights, even the most basic, are illusory if the right to vote is undermined." *Id.* at 560, 84 S.Ct. 1362 (internal quotation omitted). Citizens' First Amendment rights implicate the same pressing concerns: "The right to vote derives from the right of association that is at the core of the First Amendment, protected from state infringement by the Fourteenth Amendment." *Storer v. Brown,* 415 U.S.

724, 756, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974).

¶ 19 "It does not follow, however, that the right to vote in any manner and the right to associate for political purposes through the ballot are absolute." *Burdick v. Takushi*, 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). Rather, the United States Constitution provides that States may prescribe the "Times, Places and Manner of holding Elections for Senators and Representatives." U.S. Const. art. I, § 4, cl. 1; *see also Burdick*, 504 U.S. at 433, 112 S.Ct. 2059 ("States retain the power to regulate their own elections."). As a result, the United States Supreme Court has crafted a flexible balancing test for considering "the propriety of a state election law [in light of citizens'] First and Fourteenth Amendment rights." *Id.* at 434, 112 S.Ct. 2059.

¶ 20 The "flexible standard" requires courts to "weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments" against the State's interests "as justifications for the burden imposed by its rule." *Id.* (internal quotation marks omitted). Essentially, the severity of the burden on individuals' voting rights determines the constitutionality of the State's election procedure. *See id.*

¶ 21 With this legal framework in mind, we address how the prior participation requirement in Article XXI, section 3, burdens voters' First Amendment rights. Thereafter, we detail how this requirement also severely burdens voters' Fourteenth Amendment rights.

### A. First Amendment

¶ 22 The prior participation requirement severely burdens voters' First Amendment associational rights by unconstitutionally compelling voters to speak on the recall question.

¶ 23 The First Amendment to the United States Constitution provides that "Congress shall make no law … abridging the freedom of speech." Necessarily, this protection extends to a citizen's decision to not speak: "The citizen is entitled to … reject certain ideas or influences without Government interference or control." *Tattered Cover, Inc. v. City of Thornton*, 44 P.3d 1044, 1052 (Colo.2002) (quoting *United States v. Playboy Entm' t Grp., Inc.*, 529 U.S. 803, 817, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000)). In this context, then, the First Amendment protects voters' "right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977). Indeed, "[t]he right to speak and the right to refrain from speaking are complementary components of the broader concept of 'individual freedom of mind.' " *Id.* The prior participation requirement commands just the opposite. A citizen who wants to refrain from opining on the recall question, but who still wants to express an opinion about which successor candidate should be elected, is forced to forfeit her vote entirely for that successor candidate.[2] The provision thus compels voters, if they wish for their vote to matter, to take a position on the recall where they may have no opinion on— or even categorically oppose—such elections. Such a drastic measure undermines our founders' belief "that freedom to think as you will and to speak as you think are means indispensable to the … spread of political truth." *Whitney v. California*, 274 U.S. 357, 375, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring), *overruled in part by Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969).

¶ 24 As such, the prior participation provision is plainly unconstitutional. "A system which secures the right to proselytize religious, political, and ideological causes must also guarantee the concomitant right to decline to foster such concepts." *Wooley*, 430 U.S. at 714, 97 S.Ct. 1428. The mere fact that a voter who wishes to abstain from

---

2. The severity of the burden imposed by the prior participation requirement comes into sharper relief when one considers that, in a race involving multiple successor candidates, a voter's preference among these candidates—who may differ sharply in ideology—would be completely nullified if he or she failed or affirmatively decided not to indicate a position regarding the recall itself.

answering the recall question can still go through the motions of casting an ultimately meaningless ballot simply cannot salvage the prior participation requirement. "Concomitant with the right to cast a vote is the right to have that vote counted without undue interference with the exercise of that right." *Meyer v. Lamm*, 846 P.2d 862, 872 (Colo. 1993).

¶ 25 The prior participation requirement in Colorado's Constitution thus improperly burdens voters' associational rights by compelling speech and therefore violates the First Amendment to the United States Constitution.

## B. Fourteenth Amendment

¶ 26 The prior participation requirement also effectuates a severe restriction on citizens' fundamental right to vote. It completely invalidates a voter's otherwise legal ballot for a successor candidate where that voter simply fails—or chooses not—to vote on the wholly distinct recall issue. · For example, a voter could wish to express an opinion about the propriety of the recall elections without also wishing to choose a successor candidate. Conversely, a voter could wish to affirmatively refrain from answering the recall question due to philosophical or political objections to (or disinterest regarding) the recall of the incumbent official but nevertheless wish to cast a vote for a replacement candidate in the event that the incumbent is ousted. The prior participation requirement penalizes the latter set of voters who, for whatever reason, do not wish to participate on the recall question without offering the State any practical or administrative gain. No compelling (or even rational) justification exists to nullify a voter's entire ballot simply because he or she refrains from answering the initial recall question.

¶ 27 The severity of this burden is best understood juxtaposed against a regulation the United States Supreme Court previously approved. In *Burdick*, the Court upheld Hawaii's prohibition on write-in voting because it did "not impermissibly burden the right to vote." 504 U.S. at 430, 112 S.Ct. 2059. Most importantly, the write-in prohibition at issue helped prevent Hawaii's elections from un-raveling. *Id.* at 437–38, 112 S.Ct. 2059. It barred late participants from participating in the election to maintain the integrity of Hawaii's election process. *See id.* The Court opined that the regulation at issue merely required candidates "to act in a timely fashion if they wish to express their views in the voting booth." *Id.* at 438, 112 S.Ct. 2059; *see also Storer*, 415· U.S. at 730, 94 S.Ct. 1274 ("[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes."). The Court contrasted the limited administrative convenience rationale supporting Hawaii's write-in laws with the severe burdens imposed by laws that more fundamentally interfered with voters' rights: "Reasonable regulation of elections *does not* require voters to espouse positions that they do not support." *Burdick*, 504 U.S. at 438, 112 S.Ct. 2059.

¶ 28 In this case, the State's prior participation requirement unconstitutionally compels voters to express a view on the question of whether to recall an elected official. The voter must espouse a position even if she categorically opposes the recall mechanism, or, more benignly, has no opinion on whether a candidate should be recalled. Accordingly, though the extraordinary procedural posture of this case does not allow a fuller "weighing" of the State's interests, the United States Supreme Court's precedent (and common sense) make clear that virtually no regulation that compels voters to take a position can pass constitutional muster. *See, e.g., Anderson v. Celebrezze*, 460 U.S. 780, 792–93, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) (opining, in the ballot-access context, that "it is especially difficult for the State to justify a restriction that limits political participation" by a "group whose members share a particular viewpoint"); *Dunn v. Blumstein*, 405 U.S. 330, 336, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) ("In decision after decision, [the United ed States Supreme] Court has made clear that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction.").

¶ 29 At least one other court wrestling with this unique question has reached the

same conclusion. In *Partnoy v. Shelley,* 277 F.Supp.2d 1064, 1071 (S.D.Cal.2003), plaintiffs challenged a nearly identical provision in the California Elections Code requiring voters in a recall election to vote on the recall issue or have their vote concerning potential successors forfeited. Like this Court, the *Partnoy* court conducted the necessary balancing test without the benefit of a full record because the issue arose at the pleadings stage of the litigation. *Id.* at 1072. That court nonetheless concluded that the prior participation requirement "substantially burdens the right of citizens of California to vote on a successor governor in the event of a recall by conditioning the counting of that vote on whether the voter cast a ballot on the question of recall." *Id.* at 1078. This burden, the court reasoned, "neither advance[s] a state interest of compelling importance nor even an important regulatory interest of the State." *Id.* Thus, faced with an identical issue, and a comparable procedural posture, a federal court in California reached the same conclusion we do here: a state's prior participation requirement does not square with voters' fundamental right to vote.

¶ 30 Given that "any restrictions on [the right to vote] strike at the heart of representative government," *Reynolds,* 377 U.S. at 555, 84 S.Ct. 1362, the prior participation requirement at issue conflicts with voters' fundamental right to vote under the Fourteenth Amendment. *See also Ayers–Schaffner v. DiStefano,* 37 F.3d 726, 727 (1st Cir. 1994) (holding a requirement that limited the new election of a school board to those "voters who participated in the original balloting" to be unconstitutional and "almost inconceivable").

## IV. Conclusion

¶ 31 The provision in Article XXI, section 3, of the Constitution of the State of Colorado stating that "no vote cast shall be counted for any candidate for such office, unless the voter also voted for or against the recall of such person sought to be recalled from said office," conflicts with the First and Fourteenth Amendments to the United States

Constitution. We therefore answer the Governor's Interrogatory in the negative.

¶ 32 The provision in Article XXI, section 3, of the Constitution of the State of Colorado stating that "no vote cast shall be counted for any candidate for such office, unless the voter also voted for or against the recall of such person sought to be recalled from said office," conflicts with the First and Fourteenth Amendments to the United States Constitution. We therefore answer the Governor's Interrogatory in the negative.

¶ 33 JUSTICE MÁRQUEZ dissents, and JUSTICE COATS joins the dissent.

JUSTICE MÁRQUEZ, dissenting.

¶ 34 In a summary order, this court declared that language in article XXI, section 3 of our state constitution conflicts with individual voters' rights under the First and Fourteenth Amendments to the U.S. Constitution. It arrived at this conclusion with only minimal briefing, without a record or argument, and in reliance on a non-binding federal district court case from California. Today's advisory opinion explaining that order effectively nullifies language placed in the constitution a century ago by the voters of Colorado themselves, and does so absent any indication that any Colorado voter actually objects to this provision as a violation of his or her rights under the First or Fourteenth Amendments. In my view, the Governor's interrogatory did not warrant the court's exercise of its extraordinary constitutional authority under article VI, section 3 under these circumstances. Consequently, because I opposed the court's acceptance of the interrogatory, and because I question the majority's resolution of the federal constitutional issues raised therein, I respectfully dissent.

### I.

¶ 35 Colorado is one of a small minority of states in which the supreme court is authorized to issue advisory opinions on questions presented to it by the Governor or legislature.[1] *In re Interrogatories of Governor Re-*

---

1. The other seven states with constitutional pro-      visions allowing advisory opinions are Florida,

*garding Certain Bills of Fifty–First Gen. Assembly,* 195 Colo. 198, 214, 578 P.2d 200, 211 (1978) (Carrigan, J., dissenting); *In re Senate Resolution Relating to Senate Bill No. 65,* 12 Colo. 466, 468–69, 21 P. 478, 479 (1889). In some states, such as Rhode Island, the justices respond to such queries in their "individual capacities as legal experts rather than Supreme Court justices." *In re Advisory Opinion to Governor,* 856 A.2d 320, 323 (R.I.2004) (noting that the Rhode Island justices' role in issuing an advisory opinion is "not an exercise of judicial power"). In Colorado, by contrast, "[t]he *supreme court* shall give its opinion upon important questions upon solemn occasions when required by the governor, the senate, or the house of representatives...." Colo. Const. art. VI, § 3 (emphasis added).[2] Thus, unlike in states such as Rhode Island, in which the justices' responses are "not technically judicial decisions," here in Colorado "it is *the court,* not the justices, that must answer," and "our responses must be reported as are other opinions." *Senate Bill No. 65,* 12 Colo. at 469, 21 P. at 479 (emphasis added). We have recognized that Colorado has gone further than other states with respect to this power, which "seriously increases the danger" of its exercise. *Id.*

¶ 36 As a fundamental rule, courts do not issue advisory opinions; we decide actual cases involving disputes between real parties in interest. *See, e.g., Tippett v. Johnson,* 742 P.2d 314, 315 (Colo.1987) ("This court is not empowered to give advisory opinions based on hypothetical fact situations."). The enlargement of this court's original jurisdiction under article VI, section 3 to answer interrogatories propounded by the governor or the legislature represents an extraordinary exception to this fundamental rule. Because our exercise of this power is "devoid of nearly all the usual indicia of judicial proceedings," we made clear long ago that this "nov-

el constitutional authority" must be exercised with the "utmost vigilance and caution." *Senate Bill No. 65,* 12 Colo. at 467, 471, 21 P. at 478, 480; *In re Lieutenant Governorship,* 54 Colo. 166, 171, 129 P. 811, 814 (1913).

¶ 37 As an initial matter, it is for this court to decide whether the questions are "important" and arise from a "solemn occasion" for purposes of exercising our power under article VI, section 3. *Interrogatories by the Governor,* 126 Colo. 48, 53, 245 P.2d 1173, 1175 (1952) ("While here the Governor is first to judge the relative importance and solemnity which justifies submitting these questions, it has been uniformly held in this jurisdiction that our court must decide whether or not it should exercise jurisdiction...."); *Interrogatories by Governor,* 111 Colo. 406, 407–08, 141 P.2d 899, 900 (1943) ("As in all such original proceedings invoking our jurisdiction under this provision of the Constitution, the first question presented is whether the questions are 'important' and arise out of a 'solemn occasion' within the intent and meaning of such expressions."); *In re Lieutenant Governorship,* 54 Colo. at 171, 129 P. at 814 ("this court must decide for itself, as to any given question, whether or not it should exercise the jurisdiction of answering the same") (quoting *In re Appropriations by Gen. Assembly,* 13 Colo. 316, 321, 22 P. 464, 466 (1889)).

¶ 38 In making that determination, we have insisted that executive questions must relate to purely public rights. *Lieutenant Governorship,* 54 Colo. at 170, 129 P. at 813; *Senate Bill No. 65,* 12 Colo. at 468, 21 P. at 479 (opining that the operation of this power must be "confined to questions *publici juris* ").Conversely, we have held that this power should not be exercised to answer "questions affecting private or corporate rights." *Lieutenant Governorship,* 54 Colo. at 171, 129 P. at 814; *Senate Bill No. 65,* 12 Colo. at 468, 21 P. at 479; *Appropriations by Gen.*

Maine, Massachusetts, Michigan, New Hampshire, Rhode Island, and South Dakota. *See* Fla. Const. art. 4, § 1(c) (advisory opinions can only be requested by the governor, not the legislature); Me. Const. art. VI, § 3; Mass. Const. pt. 2, ch. 3, art. 74; Mich. Const. art. 3, § 8; N.H. Const. pt. 2, art. 74; R.I. Const. art. 10, § 3; and S.D. Const. art. V, § 5. Additionally, two states

have statutory provisions allowing advisory opinions. *See* Ala.Code § 12–2–10 (2013); Del.Code Ann. tit. 10, § 141 (2013).

2. This language was added to the constitution in 1886 by the voters of Colorado. 1887 Colo. Sess. Laws 483; *In re Interrogatories by the Governor,* 126 Colo. 48, 52, 245 P.2d 1173, 1175 (1952).

*Assembly,* 13 Colo. at 321, 22 P. at 466. *See also Certain Bills of Fifty–First Gen. Assembly,* 195 Colo. at 216, 578 P.2d at 213 (Carrigan, J., dissenting) ("An advisory opinion to the [legislature] or Governor affecting rights of private parties not granted access to the judicial process by which those rights are affected ... is highly inappropriate."). As we observed in *Senate Bill No. 65,* to use this power to answer questions affecting individual rights risks depriving parties not before the court of due process:

> It is a principle declared by our constitution ... and of universal recognition, that no person shall be deprived of life, liberty, or property without due process of law. But there cannot be due process of law, unless the party to be affected has his day in court. Yet a careless construction and application of this constitutional provision might lead to the ex parte adjudication of private rights by means of a legislative or executive question, without giving the party interested a day or voice in court.

*Senate Bill No. 65,* 12 Colo. at 469, 21 P. at 479.

¶ 39 We have also declined to answer interrogatories where hasty consideration precludes the thorough analysis and study that a particular question requires. *See In re House Bill No. 1503 of Forty–Sixth Gen. Assembly,* 163 Colo. 45, 47, 428 P.2d 75, 76–77 (1967) (declining to issue an advisory opinion on the constitutionality of a house bill relating to economic development because the "hasty consideration" required in order to serve the purposes of the Governor precluded adequate analysis of the questions presented).

## II.

¶ 40 The majority acknowledges that we refuse to exercise our extraordinary jurisdiction under article VI, section 3 to answer interrogatories where doing so would resolve "individualized" or "speculative" disputes, maj. op. ¶ 7 (citing *Interrogatories by Governor,* 111 Colo. at 411–12, 141 P.2d at 901–02); where the matter could be "brought before us through regular judicial channels," *id.* (quoting *Interrogatories by Governor,* 111 Colo. at 411, 141 P.2d at 902); or where the

questions propounded require us to prejudge "complex legal problems and fundamental constitutional questions in proceedings like this," *id.* at ¶ 9 (quoting *In re Interrogatories Propounded by McNichols,* 142 Colo. 188, 189, 350 P.2d 811, 812 (1960)). In my view, all of these circumstances were present here, weighing directly against our exercise of jurisdiction.

¶ 41 First, the rights at stake are strictly individual: the majority concludes that the language in article XXI, section 3 is unconstitutional because it violates a voter's *individual* rights under the First and Fourteenth Amendments. Maj. op. ¶¶ 21–26. The majority nonetheless concludes that the "Governor's Interrogatory implicates the very essence of the *publici juris* doctrine" by broadly characterizing a *citizen's* individual right to speak or vote as the equivalent of an interest of the *State* at large. Maj. op. ¶¶ 11–12. While I agree that the right to vote is "fundamental," maj. op. ¶ 12 (quoting *Harman v. Forssenius,* 380 U.S. 528, 537, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965)), and that the State has an important interest in regulating elections, I disagree that questions concerning a voter's exercise of individual rights under the First and Fourteenth Amendments are, in and of themselves, matters *publici juris* warranting the exercise of this court's extraordinary jurisdiction under article VI, section 3. *See, e.g., Wheeler v. N. Colo. Irr. Co.,* 9 Colo. 248, 253, 11 P. 103, 105 (1886) (describing questions *publici juris* as those "where the interest of the state at large is directly involved; where the sovereignty is violated, or the liberty of its citizens menaced" or "where the usurpation or the illegal use of [the State's] prerogatives or franchises" is the principal question).

¶ 42 The majority relies on two out-of-state cases involving original proceedings that concerned whether a particular constitutional amendment or candidate would appear on the ballot. *See* maj. op. ¶ 13 (citing *Hutcheson v. Gonzales,* 41 N.M. 474, 71 P.2d 140, 151 (1937) (granting writ of mandamus requiring Secretary of State to hold special referendum election to permit electorate to vote on proposed constitutional amendment); *State ex rel. Fosser v. Lavik,* 9 N.D. 461, 83

N.W. 914, 914–15 (1900) (granting writ of mandamus requiring county auditor to receive and place on ballot nominations for county office)). Thus, the procedural posture of those cases render them inapposite here. This court's exercise of original jurisdiction under C.A.R. 21 involves very different considerations than its extraordinary jurisdiction under article VI, section 3. See *People ex rel. Salazar v. Davidson*, 79 P.3d 1221, 1228 (exercising original jurisdiction under C.A.R. 21 where the case involved "an extraordinary matter of public importance" that cannot be left to "conventional appellate remedies"). Moreover, even assuming, arguendo, that the election issues in those cases qualify as matters *publici juris*, it is because they concern matters that relate to the election itself (e.g., whether a particular measure or candidate will appear on the ballot), and thus, impact the entire electorate equally. By contrast, the majority's own merits analysis reveals that the issue here is whether an *individual* voter's rights to speak or vote are violated where that (hypothetical) *individual* personally wishes to participate in the election but abstain on the recall question. Thus, contrary to our case law, this court exercised its extraordinary jurisdiction here to address a matter affecting purely private rights.[3]

¶ 43 Second, and even more problematic, the alleged conflict presented by the interrogatory was merely speculative. At the time the court issued its summary order, we had before us *no actual voter* who objected to voting on the recall question as a condition to voting on a successor candidate. In the absence of any actual voter challenging this provision as violating his individual constitutional rights, it was unnecessary—and in my view, inappropriate—to address this hypothetical question. See *Developmental Pathways v. Ritter*, 178 P.3d 524, 535 (Colo.2008) (principle of judicial restraint requires this

court to avoid reaching constitutional questions that are not ripe for review); *People v. Lybarger*, 700 P.2d 910, 915 (Colo.1985) ("Axiomatic to the exercise of judicial authority is the principle that a court should not decide a constitutional issue unless ... the necessity for such a decision is clear and inescapable.").

¶ 44 Third, even assuming such a voter exists, that voter could readily present this constitutional claim through ordinary judicial channels. My concern here is exacerbated by the severe time constraints under which this court chose to exercise its jurisdiction and decide this matter. In my view, the "hasty consideration" required to issue a ruling before the election precluded adequate analysis of the question presented. See *House Bill No. 1503*, 163 Colo. at 47, 428 P.2d at 76–77. The majority explains that the matter had to be decided because there are no "do overs" in elections. Maj. op. ¶ 14. Yet nothing would prevent this court from adjudicating such a dispute through the normal litigation process, even if the claims were resolved after the election. The U.S. Supreme Court has often adjudicated challenges to election provisions affecting individual constitutional rights in such a procedural posture. See, e.g., *Clingman v. Beaver*, 544 U.S. 581, 584, 125 S.Ct. 2029, 161 L.Ed.2d 920 (2005) (deciding a challenge brought by a political party prior to 2000 election); *Burdick v. Takushi*, 504 U.S. 428, 430, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (deciding the constitutionality of a state law prohibiting tabulation of write-in votes in 1986 election); *Anderson v. Celebrezze*, 460 U.S. 780, 783, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) (deciding a challenge by a candidate who was excluded from the 1980 presidential election ballot); *Rosario v. Rockefeller*, 410 U.S. 752, 755, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973) (deciding a challenge brought by individuals ruled ineligible to vote in 1972 election).

---

**3.** The majority's reliance on *In re Advisory Opinion to Governor*, 856 A.2d 320 (R.I.2004), is likewise misplaced. Maj. op. ¶ 13. As noted above, the power to answer interrogatories under Rhode Island law is very different than the extraordinary jurisdiction granted to this court under article VI, section 3. Moreover, the Rhode Island justices acknowledged that the question presented in that case did not even meet their state constitutional standard to require the jus-

tices' response; instead, the justices simply exercised their discretion to give an advisory opinion because the issues raised were of "great public and constitutional importance." 856 A.2d at 325. Thus, the Rhode Island justices' wholly discretionary decision in that case should not inform this court's exercise of its rare and extraordinary jurisdiction under article VI, section 3.

That the resolution of important constitutional rights through ordinary litigation may result in some delay does not, by itself, warrant exercise of our extraordinary jurisdiction under article VI, section 3. "Reasonable time must always be allowed for the consideration of the rights of the parties, in the administration of justice under a free government.... Reasonable delay is the price we pay in order to secure the protection and vindication of personal ... rights under a government like ours." *In re Fire & Excise Comm'rs,* 19 Colo. 482, 504, 36 P. 234, 242 (1894).

¶ 45 As a practical matter, it was not necessary to resolve the issue in order for the election to proceed. Nothing in the challenged state constitutional provision expressly prevents a voter from *casting a ballot* that abstains ·on the recall question but casts a vote for a successor; the question, of course, is whether the successor votes cast on such ballots are ultimately counted. However, the answer to this question need not be resolved prior to the election. Assuming such votes were cast, election officials could set aside these ballots pending resolution of a legal challenge to the provision, and the final tallies could be adjusted if necessary.[4] The relatively small number of such votes [5] would be unlikely to make this process unduly cumbersome. In short, because this constitutional claim, if brought by an actual voter, could be raised and adjudicated through the normal judicial process, it was unnecessary for this court to exercise its extraordinary jurisdiction to decide this issue prior to the election.

¶ 46 I acknowledge that relatively recently this court answered an interrogatory from the Governor concerning a conflict between certain Colorado campaign finance provisions and the U.S. Supreme Court's decision in *Citizens United v. Federal Election Commission,* 558 U.S. 310, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010). *See In re Interrogatories Propounded by Governor Bill Ritter, Jr., Concerning the Effect of Citizens United v. Federal Election Comm'n, 558 U.S. —— (2010) on Certain Provisions of Article XXI-II of the Constitution of the State of* Colorado, 227 P.3d 892 (Colo.2010). The issues presented in those interrogatories arguably affected corporate rights. However, the circumstances of that matter were quite different from those presented here. This court accepted those interrogatories not on the eve of an election, but at the very beginning of the 2010 general election cycle—with ample time to consider the issues. Unlike the present matter, this court received briefing in that ˙case from directly affected parties, including several labor organizations stating their intent to engage in independent candidate-related speech and representing that they stood to be held in violation of the challenged Colorado campaign finance provisions pending resolution of the constitutionality of those provisions. Most importantly, the question in that matter rested on a direct conflict between provisions of the Colorado Constitution and the U.S. Supreme Court's decision in *Citizens United,* which declared certain provisions of federal campaign finance law unconstitutional. The Governor and the Secretary of State, along with every other interested party that filed briefing with the court, agreed that the *Citizens United* decision rendered the comparable Colorado provisions likewise unconstitutional. Thus, given the binding U.S. Supreme Court decision on point, the legal conclusion in that case was all but inescapable. By contrast, the issue here is hardly clear-cut.

### III.

¶ 47 "In construing a constitutional amendment, our goal is to determine and give effect to the will of the people in adopting the measure." *Huber v. Colo. Mining Ass'n,* 264 P.3d 884, 889 (Colo.2011). "We presume legislative enactments, whether by the General Assembly or the electorate through initiative or referendum, to be constitutional. Overcoming this presumption requires a showing of unconstitutionality beyond a reasonable doubt." *Id.*

---

**4.** Of course, no vote for a successor is counted unless the incumbent is actually recalled by a majority.

**5.** I presume such a voter would be rare, given that none was brought to this court's attention.

¶ 48 Here, the majority has exercised its extraordinary jurisdiction to declare that language placed in the state constitution a century ago by the voters of Colorado violates voters' individual rights under the First and Fourteenth Amendments. Unlike the *Citizens United* decision, which directly addressed the type of campaign finance provisions at issue in the Governor's 2010 interrogatories, the U.S. Supreme Court has never addressed, let alone resolved, the constitutionality of a conditional vote requirement such as Colorado's. We have no binding precedent on point that compels the conclusion that the language in article XXI, section 3 is unconstitutional beyond a reasonable doubt. Given that "declaring a statute or a constitutional amendment to be unconstitutional is one of the gravest duties impressed upon the courts," *Huber*, 264 P.3d at 889, I am concerned that the court reached this conclusion so swiftly on the basis of minimal briefing, without the benefit of a record or oral argument, and again, without any actual voter before us who challenged article XXI, section 3 as a violation of his or her federal constitutional rights. The court's expedited resolution of this constitutional issue simply underscores my objection to our exercise of jurisdiction in this case.

¶ 49 In the absence of U.S. Supreme Court precedent on this type of election provision, the majority relies on a non-binding federal district court decision, *Partnoy v. Shelley*, 277 F.Supp.2d 1064 (S.D.Cal.2003),[6] for its purported similarity to this case. Maj. op. ¶ 28. However, *Partnoy* was not decided in a "comparable procedural posture." *Id.* Unlike the interrogatory here, *Partnoy* involved actual litigation brought by registered voters[7] who sought to enjoin the enforcement of California Elections Code section 11382 and obtain a declaration that section 11382 violated the federal constitution. *Partnoy*, 277 F.Supp.2d at 1070. The plaintiffs in *Partnoy* directly alleged that they wanted to vote for a successor candidate for Governor, but intended to abstain on the recall question because they were agnostic on the merits of the recall, or were morally and/or politically opposed to the recall process generally. *Id.* at 1071. In addition, the judge in *Partnoy* received full briefing and arguments from the State defending the purpose and constitutionality of the challenged statutory provision. Here, by contrast, the entire matter was filed, accepted, briefed, and the constitutional issues resolved through a summary order in a matter of days.[8] In my view, the constitutional issues presented here are not as straightforward as the court's resolution suggests.

¶ 50 "Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections." *Burdick*, 504 U.S. at 433, 112 S.Ct. 2059. "[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." *Storer v. Brown*, 415 U.S. 724, 730, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974); *see also Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997) ("[I]t is ... clear that States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder.").[9]

¶ 51 All election laws invariably impose some burden on individual voters, whether the provision addresses the qualifications of voters, the selection and eligibility of candidates, or the voting process itself. *See Burdick*, 504 U.S. at 433, 112 S.Ct. 2059 (citing

---

**6.** *Partnoy* was decided by a single federal judge, was never appealed, and carries no precedential value even in its own judicial district.

**7.** The plaintiffs in *Partnoy* also included the California Informed Voters Group, an unincorporated association. 277 F.Supp.2d at 1072.

**8.** The majority acknowledges that this court gave interested parties less than one day to submit briefing. Maj. op. ¶ 4.

**9.** Contrary to the majority's suggestion, the source of the State's authority to regulate state elections does not flow from article I, section 4 of the U.S. Constitution. Maj. op. ¶ 18. That provision concerns the State's authority to establish the times, places, and manner of congressional elections.

*Anderson,* 460 U.S. at 788, 103 S.Ct. 1564). Accordingly, the U.S. Supreme Court has held that a constitutional challenge to a specific provision of a State's election laws must be resolved through "an analytical process that parallels [a court's] work in ordinary litigation." *Anderson,* 460 U.S. at 789, 103 S.Ct. 1564. First, it must consider "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Id.* Next, it must "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Id.* The court must "not only determine the legitimacy and strength of each of those interests; it must consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* Importantly, "[o]nly after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional." *Id.*

¶ 52 Here, the majority concludes that the conditional vote requirement of article XXI, section 3 "severely burdens" voters' individual First and Fourteenth Amendment rights because it compels their speech. Maj. op. ¶¶ 21, 26. It further concludes that "no compelling (or even rational) justification exists" for this requirement. *Id.* ¶ 26. Yet, in my view, no legitimate "weighing" of interests was possible here, given that no record was developed in this case. Under the circumstances here, it was impossible to fully "identify and evaluate" whatever "precise interests" the State may have offered to justify the burden imposed by this provision. In short, because this court was unable to weigh the competing interests at stake, it was not in an adequately informed position to decide the constitutionality of this provision under the framework set forth by the U.S. Supreme Court in *Anderson.*

¶ 53 The history of these conditional vote provisions indicates that they originated in

Oregon in the early twentieth century. In the 1908 general election, Oregon voters adopted, through a citizen initiative, a constitutional amendment that provided for the recall of state officers. *See* Or. Const. art. II, § 18 (1908); *see also* 1909 Or. Laws 9. Under the Oregon provision, a citizen petition could trigger a recall election in which the incumbent was placed on the ballot alongside successor candidates. Voters cast their choice on a single question: who should fill that office? The candidate who received the largest number of votes was elected to that office. Notably, Oregon's process of placing the incumbent on the ballot with other successor candidates theoretically allowed an incumbent to retain office with less than a majority vote.[10]

¶ 54 California's recall provision was added to the state constitution at a special referendum election in 1911. Cal. Const. art. XXIII (1911); *see also* 1911 Cal. Stat. 2032–36, approved Oct. 11, 1911.[11] The amendment, as originally proposed in the state senate, provided for a procedure substantially similar to the Oregon procedure. Franklin Hichborn, *Story of the Session of the California Legislature of 1911* 123–24 n.147 (1911). However, during the legislative process, the legislators decided that an incumbent should be recalled only where a majority of voters favored his removal. S. Journal, 39th Sess., at 1078 (Cal. 1911). The legislators therefore proposed a threshold question: should the incumbent be recalled? *Id.* Only where a majority voted "yes" would the votes for a successor be tallied. *Id.*

¶ 55 California's proposed two-question ballot gave rise to the question of whether the incumbent should be placed among the successor candidates. The California legislators decided not to permit this, apparently concluding that where an incumbent has lost the support of a majority of the electorate (as shown by the result of the recall question),

---

10. For example, if a recall election yielded a field of four candidates (including the incumbent), and votes were generally evenly spread among all four candidates, the incumbent could retain office with 26% of the vote, even though collectively, 74% of the electorate voted against that incumbent.

11. Article XXIII of the California Constitution was later repealed and replaced in part by article II, section 15 in 1976. The statutory conditional vote provision in *Partnoy* was derived from language that had appeared in article XXIII. *See Partnoy,* 277 F.Supp.2d at 1071.

the incumbent should not be permitted to run as a successor. However, the rationale for excluding the incumbent from running as a successor is premised on the assumption that the voters choosing the successor are the same voters who voted to recall the incumbent. Hence, California's provision allowed voters to vote for a successor only if they voted on the recall question.

¶ 56 Colorado's recall provision was added to the state constitution by citizen initiative the following year. Like California's provision, the Colorado provision bars incumbents from appearing on the ballot as a successor. Colo. Const. art. XXI, § 3 ("The name of the person against whom the petition is filed shall not appear on the ballot as a candidate for the office."). Although we have before us no record or argument confirming whether Colorado's prior participation requirement may have been enacted for the same or similar reasons it was adopted in California, the history of the development of these provisions suggests that the voters of Colorado had a legitimate, and certainly rational, basis for the requirement.

¶ 57 Here, the voters of Colorado decided, through citizen initiative, to establish a recall process that combines the recall question and the choice of a successor into a single election. In so doing, the citizenry decided that an incumbent shall be recalled only where a majority of those voting favor removal of the incumbent. *Id.* Accordingly, votes for a successor are tallied only where the incumbent is actually recalled. In this sense, the choice of a successor is derivative of the recall issue. Thus, I disagree that these issues are in fact "wholly distinct," maj. op. ¶ 26, at least where, as here, the voters of Colorado decided to combine them into a single election process.[12] By requiring a voter to vote on the recall question as a condition to voting for a successor, this provision ensures that the citizens seeking to elect a particular successor are the same group of citizens who decided, by majority vote, to have the incumbent removed.

¶ 58 I note that a voter who chooses to participate in the election because he genu-

inely wants his or her desired successor to serve as the elected representative logically would express that opinion by voting "yes" on the recall question. This is because the voter's desired successor can serve only if the incumbent is actually recalled. On the other hand, a voter who wants to cast a vote for a successor but wishes to abstain on the recall question because he opposes the recall process logically would express that opinion by voting "no" on the recall question in order to prevent the recall from succeeding. Yet neither voter's speech is compelled. The majority's hypothetical voter is already sufficiently motivated to participate in the election in order to choose a successor candidate. Given that, it is not an inherently substantial burden to require such a voter, on that same ballot, to answer the threshold recall question, the outcome of which will determine whether *any* of the votes for a successor will be counted.

¶ 59 Importantly, I believe that the majority's opinion today effectively alters the constitutional formula established by the people of Colorado for the recall of its officers. By allowing voters who participate in the choice of a successor to abstain on the recall question, the total number of persons actually voting on the recall question is diminished, and thus, the number of votes necessary to establish the "majority" required to oust an incumbent is reduced.

¶ 60 Thus, I disagree with the majority that no legitimate basis for the provision exists. *See* Maj. op. ¶ 26. My point is simply that, given the hypothetical nature of the dispute and the severe time constraints under which this matter was decided, the majority was not in a position to fully weigh the potential interests at stake.

## IV.

¶ 61 In my view, this court has used its rare and extraordinary power granted by article VI, section 3 in unprecedented fashion. In response to an executive interrogatory presented on the eve of an election, the court has effectively invalidated state consti-

---

12. This unified election process distinguishes this provision from the sequential elections that oc-

curred in *Ayers–Shaffner v. DiStefano,* 37 F.3d 726 (1st Cir.1994) (cited at maj. op. ¶ 29).

tutional language on grounds that it violates voters' individual federal constitutional rights. And it has done so where no voter has actually objected to the provision. Such constitutional claims, if actually raised by registered voters, should be addressed only through "regular judicial channels." *Interrogatories by Governor*, 111 Colo. at 411, 141 P.2d at 902. Accordingly, I respectfully dissent.

I am authorized to state that Justice COATS joins in the dissent.

2013 CO 63

**A.S., Petitioner**

**v.**

**The PEOPLE of the State of Colorado, Respondent.**

**Supreme Court Case No. 12SC396**

Supreme Court of Colorado.

October 28, 2013